**ALPO PETFOODS, INC., Plaintiff,**

v.

**RALSTON PURINA COMPANY, Defendant.**

**Civ. A. No. 86-2728.**

United States District Court, District of Columbia.

July 28, 1989.

Richard J. Leighton, Richard F. Mann, Douglas J. Behr, Lewis Bernstein, Susan Anthony, and Anita M. Nanni, Leighton and Regnery, Washington, D.C., for plaintiff.

Michael L. Denger, John W. Behringer, Willard K. Tom, Steuart H. Thomsen, Bruce M. Bettigole, and Lee H. Pelton, Sutherland, Asbill & Brennan, Washington, D.C., (Dennis D. Fales, Stanley M. Rea, and Tammy T. Walsh, Ralston Purina Co., St. Louis, Mo., of counsel), for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

### PRELIMINARY ISSUES

This court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 under the Lanham Act regarding the parties' claims of false advertising. This court has pendent jurisdiction over the state statutory and common law claims.

Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391.[1]

*Background*

The core of this suit pertains to the puppy food advertising campaigns of the parties. The campaigns were conducted during approximately the same period of time, from the beginning of October 1985 to the end of September 1986. Plaintiff ALPO Petfoods, Inc. ("ALPO") challenges defendant Ralston Purina Company's ("Ralston") claim that Ralston Puppy Chow products are formulated to reduce hip joint laxity and improve hip joint fit in puppies, thereby lessening the severity of Canine Hip Dysplasia ("CHD").[2] By counterclaim,

---

1. Defendant's motion to transfer venue to the Eastern District of Missouri was denied.

2. Canine Hip Dysplasia describes the abnormal development of the bones, surrounding soft tissue, muscles, and fluids in a dog's hip joints. Dysplasia is derived from the greek words: "dys," meaning poor or abnormal, and "plasia," meaning growth. The disease has no cure and is degenerative in nature. In severe cases there is deterioration of the hip joint bones and cartilage, and formation of bony growths, a condition known as degenerative joint disease. This further inhibits joint flexibility and irritates surrounding tissue to the point where movement of the leg can be so painful that the dog is unable to walk. CHD can severely and permanently cripple a dog, and in its advanced stages the dog must be put to sleep.

Hip joint laxity describes the laxity or space between the ball of the femoral (leg) bone and the socket of the hip. Such a condition does not necessarily affect a dog's locomotion. While not proven, researchers have hypothesized that hip joint laxity may lead to the development of Canine Hip Dysplasia.

Ralston challenges ALPO's claim that veterinarians prefer the "formula" in ALPO Puppy Food "2 to 1" over the leading puppy food.

Ralston is a Missouri Corporation with its principal place of business in St. Louis, Missouri. Ralston manufactures and markets Puppy Chow dry puppy food and Puppy Chow Chewey Morsels, a soft-dry puppy food. Puppy Chow dry food was introduced in 1964. Puppy Chow Chewey Morsels was introduced in April 1985. Puppy Chow is marketed nationally and since 1964 has been the leading puppy food in the United States by a wide margin.

ALPO, a subsidiary of Grand Metropolitan, is a Pennsylvania Corporation with its principal place of business in Pennsylvania. ALPO is the second largest seller of puppy food in the United States. It manufactures and markets ALPO Puppy foods in both canned and dry form, primarily in the eastern part of the United States, a market that includes approximately thirty-six percent of the population of the United States. Both forms of ALPO puppy food were introduced in January 1985.

*Procedural History*

On October 3, 1986, plaintiff ALPO filed suit alleging that Ralston violated the Lanham Act and engaged in unfair competition. ALPO claims that Ralston advertisements and promotions, which state that Puppy Chow puppy foods contain a formula that reduces hip joint laxity, promotes proper hip joint development and lessens the severity of canine hip dysplasia and degenerative joint disease ("CHD claims"), are false, misleading and deceptive in violation of § 43(a) of the Lanham Act and the common law. ALPO has also put in issue Ralston's claims that its Puppy food has superior digestibility compared to its competitors' brands.

Ralston filed a counterclaim alleging that ALPO's claims that ALPO Puppy Food was more digestible than other puppy food brands, and that ALPO's formula was preferred by veterinarians over competing brands and the "leading brand" were false,

misleading and deceptive in violation of both § 43(a) of the Lanham Act and the common law. Ralston also alleges that ALPO's statements to veterinarians and the news media regarding Ralston's CHD claims constituted unfair competition, deceptive trade practices, and defamation.

ALPO has charged that Ralston's claims are frivolous and in violation of Fed.R. Civ.P. 11.[3]

Both parties seek permanent injunctions prohibiting further publication of these alleged false claims. ALPO seeks an additional order requiring Ralston to issue corrective advertising regarding its allegedly false CHD claims. Both parties seek treble damages, the disgorgement of profits made from the false advertising, costs and attorneys' fees under § 35 of the Lanham Act and punitive damages pursuant to their common law claims.

The parties waived their right to a jury trial, and a trial by the court was conducted over a period of approximately 61 days.

After a considered review of the evidence and testimony offered at trial, the pleadings and the arguments of the parties, the court finds that both parties have made false, deceptive and misleading claims which are actionable. In this respect, both parties are entitled to relief, the extent to which is set out later in this opinion. Because liability has been found and relief has been granted under the Lanham Act, this court does not reach the question of whether the parties' actions constitute common law false advertising or unfair competition. The parties' respective claims, to the extent this court finds the conduct of the parties actionable, can be fully vindicated under the Lanham Act.

The court also finds that ALPO's statements to the media and the public regarding the challenged CHD claims are not defamatory and do not constitute unfair competition or deceptive trade practices.

## FINDINGS OF FACT

For almost twenty-five years since its introduction in 1964, Ralston's Puppy Chow

---

**3.** In light of the findings in this opinion, I find that this claim lacks merit.

has dominated the puppy food market. While a number of competing foods have appeared since the early 1980's, few competitors with the exception of ALPO's puppy food have obtained a significant share of the market.

ALPO introduced ALPO Puppy Food in its East Coast markets in January 1985. During the time period relevant to this action, from the beginning of October 1985 to the end of September 1986, ALPO controlled approximately 22 percent of the non-Ralston puppy food sales.

*Ralston's Puppy Chow Claims*

In August 1985, Ralston began a 5.2 million dollar marketing campaign in which it claimed that Ralston Puppy Chow products helped reduce hip joint laxity in dogs and helped dogs develop a snugger hip joint fit, thereby reducing the incidence of CHD and degenerative joint disease. To veterinarians, dog breeders and owners, Ralston's claims were spectacular because Canine Hip Dysplasia is one of the most feared dog diseases. It is incurable and is difficult to treat. Dogs with CHD cannot be used for breeding or in competition. In its advanced stages CHD is so painful and debilitating that the afflicted dog must be put to sleep. Such claims had a particularly high degree of credibility because of Ralston Purina's preeminent position in the pet food business.

The alleged offending claims made by Ralston took several forms and at times were addressed to different audiences. The claims were direct. They included:

[New] Reformulated Puppy Chow brand puppy foods ... can reduce the severity of Canine Hip Dysplasia ...

[Test] Results demonstrate ... Hip joint laxity—REDUCED ... Dysplastic hip deterioration—REDUCED.

Puppy Chow helps prevent CHD.

New Puppy Chow is formulated with a superior CHD nutrient profile to reduce hip joint laxity ... [and is] specially developed to help promote close hip joint fit.

[Puppy Chow is] Specially formulated to improve hip joint fit in growing puppies [and] reduce hip joint laxity which lessens the severity of Canine Hip Dysplasia.

The first of Ralston's challenged advertisements appeared in a number of leading veterinarian publications which announced in large, bold type "A SCIENTIFIC BREAKTHROUGH IN CANINE NUTRITION". They stated that the Ralston scientists had "concentrated [their] efforts on the critical developmental period—up to two years of age" and

[Their] studies demonstrate that a superior CHD balanced diet is beneficial for maintaining a closer hip fit in puppies which can reduce hip joint deterioration in dogs prone to canine hip dysplasia.

The advertisements stated that new Puppy Chow is "formulated to: improve hip joint fit ... [and] reduce hip joint laxity," and that Puppy Chow is "the only puppy food specifically formulated to improve hip joint development during the entire growth period, which reduces the severity of canine hip dysplasia." Such ads ran in veterinarian magazines through October 1986.

During this period, Ralston distributed printed promotional materials to veterinarians which claimed that Puppy Chow products had been reformulated to "reduce hip joint laxity" and "improve hip joint development" which would "reduce the severity of Canine Hip Dysplasia" ("CHD").

In December 1985, Ralston distributed a research monograph on Canine Hip Dysplasia through direct mass mailings to veterinarians across the country and at Veterinarian Medical Association conferences. The monograph was also sent out to inquiring dog breeders, consumers, television networks and various state and federal regulatory officials who sought substantiation for Ralston's CHD claims. Ralston's veterinary sales representatives were also briefed on how to respond to questions regarding Ralston's CHD claims.

As part of its sales promotion, Ralston provided veterinarians with pamphlet racks and accompanying pamphlets called Pet Care Reports. The racks were checked and refilled monthly with new Pet Care Reports. From January to October, 1986,

these reports carried three pages of advertisements containing CHD claims.

During this period, Ralston made available to veterinarians at no charge a free-standing office display and packets of 100 CHD brochures, dedicated entirely to CHD and Ralston's CHD claims. The brochure, entitled "A Purina Breakthrough Can Improve the Quality of Your Puppy's Life," was ultimately intended for distribution to dog owners. Ralston also provided to veterinarians so-called Puppy Care Kits—a ten ounce carton of new Puppy Chow and a pamphlet containing information regarding the CHD benefits of the new food.

Ralston directed its CHD claims at dog breeders, hunters and other dog enthusiasts. It published a number of CHD related advertisements in a variety of publications directed to these audiences, including *American Field, Dog World, Canine Chronicle, Bloodlines: Dog and Pet Stock Journal,* and *Hounds & Hunting.* Those advertisements ran from November 1985 to September 1986. Breeders were also provided with Puppy Starter Kits for redistribution to their customers. CHD claims were contained in the May 1986 printing of the Starter Kit booklet.

The explicit claims made in those advertisements and pamphlets were virtually identical to the claims made to veterinarians. The ads claimed that Puppy Chow "reduces hip joint laxity during the growth period, which decreases degenerative joint disease in hereditary Canine Hip Dysplasia" and "... CAN SIGNIFICANTLY REDUCE THE SEVERITY OF CANINE HIP DYSPLASIA."

Finally, Ralston made extensive CHD claims concerning Puppy Chow to the buying public. The ads stated that Puppy Chow "promotes better hip joint development," helps "hip joints ... develop a snugger, better fit," and "help[s] reduce the severity of Canine Hip Dysplasia."

From January through June, 1986, Ralston ran such advertisements in 15 different consumer publications, including *Good Housekeeping, McCall's Magazine,* and *Family Circle.* Ralston also distributed two freestanding newspaper inserts containing CHD claims, which were placed in Sunday newspapers nationwide. CHD claims were also found in coupons mailed directly to households in the ALPO East Coast marketing area. CHD claims were made during the campaign period to consumers who called Ralston's 800 number asking for information about new Puppy Chow. Pet owners were also exposed to CHD claims through Pet Care booklets given to veterinarians and breeders for redistribution to dog owners.

The court finds that the target audiences viewing the CHD claims in print advertisements and promotional material took away the literal claims made. What is more, some of those audiences took away an implicit message that Puppy Chow "prevents" or "cures" CHD. This finding is supported by audience focus group and survey research, and actual testimony of members of the audience exposed to these ads. The results of Ralston's prepublication consumer focus group testing show that people who were exposed to claims identical to those used in Ralston's campaign took away the intended message. The results of the consumer survey conducted by Burke Market Research on consumer perception of one of Ralston's major CHD advertisements show a significant number of consumers exposed to the advertisement (thirty-eight percent) interpreted it as linking such a diet to the prevention of CHD. Ralston's own survey of veterinarians taken during the advertising campaign showed that 74 percent of those surveyed who were advertising-conscious had a detailed, unaided recollection that Ralston was advertising that Puppy Chow could prevent CHD. Additionally, witnesses from each of the three target audiences testified that they interpreted the advertisements as claiming that Puppy Chow could help prevent or cure hip joint laxity and CHD.

CHD related claims were also made by Ralston on television in what have been identified as Puppy Chow's "Baby New" commercials. Between June 26, 1986, and October 16, 1986, Ralston broadcast on national television networks a thirty second

version of the "Baby New" advertisement for Puppy Chow. While it made no explicit CHD or hip related claims, the commercial visually featured a package of the new product with its sell line of "Extra Nutrition for First Two Years," and stated that Puppy Chow "help[s] critical bone development".[4] When asked by the networks to provide substantiation for the claims made in these commercials, Ralston cited its CHD research and provided a copy of a monograph entitled *Ralston Purina Nutritional Research on Canine Hip Dysplasia.*

ALPO alleges that Ralston has made collateral representations in its CHD advertisements that are also false and misleading. The court has examined four of these claims.[5]

■ The first, "One out of every two puppies" has some degree of hip dysplasia and "[CHD] is estimated to affect as much as fifty percent of the total dog population," appears as a preface in advertisements containing explicit CHD claims. The evidence presented to the court showed that only 50 percent of large dogs have some degree of hip dysplasia and that the rate of affliction for all dogs is lower. The court finds that while Ralston's claim is somewhat exaggerated, the fact is that CHD is a prevalent condition in dogs, particularly large dogs. Accordingly, the court finds that this statement, although technically incorrect, is not actionable.

■ Second, Ralston makes the claim in one of its veterinary advertisements that "Puppy Chow can lessen the degree of osteokinetic bone trauma in puppies up to two years of age." The court finds this claim deceptive. The advertisement claims to ameliorate what expert testimony identified as a nonexistent condition, "osteokinetic bone trauma," in puppies up to "two years of age". The evidence shows that at that time Ralston had not tested the effects of its new formula on puppies beyond one year of age.

Third, ALPO also alleges that the statement on the front of bags of Puppy Chow dry dog food, "Extra Nutrition for First *Two* Years" was a CHD related claim. This Court finds there is some relationship between this claim and the similar claims made in connection with Ralston's CHD "Baby New" television commercial. Clearly, consumers seeing the commercial which juxtaposes the claim of "extra nutrition for the first two years" with the claim that Puppy Chow helps "critical bone development" would likely be conditioned into taking away the "critical bone development" message when they see the "Extra nutrition for the first two years" language on the front of the Puppy Chow dry dog food package. Thus, it is not unreasonable to conclude that consumers would be persuaded after they have seen the "Baby New" commercial to expect that they would obtain for their dogs better "bone development" when they actually purchased the package of dog food with the claim of "Extra nutrition for the first two years" emboldened on the package.

■ Fourth, Ralston claims that "Puppy Chow is the *only* puppy food specially formulated to reduce hip joint laxity in growing puppies, which can lessen the severity of Canine Hip Dysplasia." The evidence presented to this court shows not only that the basic CHD claim was false, but that at the time this representation was made at least one existing competitive dog food also contained a low anion gap formula. This formula, which Ralston claims to be exclusive to Puppy Chow, is the very trait upon which Puppy Chow's CHD claims are based.

### Ralston's Intent

The court finds that Ralston intended to communicate the claim that new Purina

---

**4.** Two shorter, fifteen second versions of this commercial made no mention of "critical bone development" and this court finds that plaintiff has failed to produce any substantive evidence that these versions conveyed any CHD or hip related message.

**5.** Although the materiality of collateral false claims is difficult to determine, their existence and Ralston's intent to communicate such claims are probative in determining Ralston's intent in communicating the main CHD claims.

Puppy Chow reduces hip joint laxity and improves hip joint fit, thereby reducing the severity of CHD, and degenerative joint disease. An examination of the "copy platforms" created by Ralston's advertising agencies and approved by Ralston shows that the CHD message was targeted at three main groups: veterinarians, dog breeders and other dog enthusiasts, and the buying public. According to Ralston's internal marketing and advertising memoranda, these audiences offered an excellent opportunity to increase puppy food sales.

The explicit objective of the Ruther Advertising Agency's "professional" CHD advertising campaign was to use the CHD claims to convince the veterinarian and breeder target audiences that Puppy Chow was superior to all other puppy foods for canine bone growth and development. The campaign was designed to communicate "vital information" that was "supported by strong clinical data." By directing Ralston CHD claims at veterinarians, Ralston attempted to use that audience's ability to influence the purchasing decisions of their clients. If veterinarians could be convinced that Puppy Chow could reduce hip joint laxity and lessen the severity of CHD, veterinarians would pass that information to their clients.

Ralston intended that its CHD claims have a similar effect on breeders. The breeder advertisements encouraged the purchase of Puppy Chow, since breeders purchase substantial amounts of dog food for their own use and for resale. Other dog enthusiasts were targeted because they are heavy users of dog food and are often breeders as well.

The Gardner Agency, which produced the general consumer advertising campaign, employed the CHD claims to convince their target audience that Puppy Chow was superior to all other puppy foods.

This court finds that Ralston intended to use its CHD related claims to influence the purchasing decisions of consumers and finds that the CHD claims were effective in that regard. Ralston's pre-publication tests showed that consumers reacted enthusiastically to the CHD claims in Ralston's advertising. The results of Ralston's focus group research showed that consumers reacted very positively to claims that Puppy Chow could reduce hip joint laxity and the severity of CHD. The focus group evidence revealed that the test audiences considered the claims to be important, attention getting, and relevant to the health of dogs. The prepublication research also showed that consumers exposed to the claims would consider buying Puppy Chow products. Ralston advertising memoranda reported that those ads with headlines announcing "A Nutritional Breakthrough" and containing the CHD message "pushed purchasing intent very high."

This court finds that Ralston intended to use the CHD campaign to gain an edge on its competitors, preserve its market share, and blunt any national introduction of ALPO Puppy Food. This later finding is based on the court's examination of internal marketing plans during the CHD advertising campaign which describe ALPO as the chief competitive threat to Puppy Chow.

Internal statements of Ralston's marketing objectives, formulated and approved by Ralston executives during the CHD campaign, identify ALPO as "potentially the greatest threat faced by Puppy Chow." The testimony of Terence E. Block, Ralston's Director of Marketing for Dog Food, indicates that the CHD campaign was used to defend Puppy Chow from its competition, ALPO Puppy Food and Kibbles 'n Bits. ALPO Puppy Food was featured in a number of Ralston's published advertisements.

*Support for Ralston's Claims*

Ralston bases its claims on the results of research and testing conducted during the early 1980's. None of its individual tests produced statistically significant results on their own.[6] However, Ralston maintains

---

6. Statistical significance in this context means that the probability that the results of Ralston's experiments could have occurred by chance is less than 5 percent. The 5 percent figure is commonly used as a measure of statistical significance. *See, e.g., Segar v. Smith,* 738 F.2d

that by pooling the results of several tests it obtained significant results that substantiate its claims.

ALPO maintains that the results of the Ralston tests were not statistically significant and should not be pooled. ALPO states that the tests were not sufficiently reliable to permit Ralston to draw any reasonable conclusions from them. ALPO claims flatly that hip joint formation and CHD are inherited conditions not affected by the nutritional balance in a dog's diet, and asserts that Ralston's CHD claims are simply false, and without any reasonable basis in fact.

This court concurs with ALPO's view. The overwhelming weight of scientific authority indicates CHD is a hereditary disease and there is no reliable evidence that nutritional balance in a puppy's diet affects hip joint laxity, hip joint fit, CHD or degenerative joint disease. Ralston's research does not show that its puppy food reduces hip joint laxity. As a result, Ralston's CHD claims are false.

### Canine Hip Dysplasia (CHD)

A range of symptoms often appears in dogs affected with CHD. Decreased activity and painful movement are often observed in puppies between four and twelve months old, but such symptoms are not conclusive evidence that a puppy has CHD. Diagnosis of the disease is particularly difficult and cannot be accomplished with certainty until the dog reaches maturity, between one and two years of age. At that point the disease is difficult to treat. In severe cases veterinarians will implant a ball and socket prosthesis or perform hip replacement or arthroplasty (removal of the femoral head). In its most advanced stages, the symptoms of CHD are so severe that the dog must be put to sleep.

CHD is essentially an inherited, genetically determined condition. Dogs afflicted with the condition can pass it along to their offspring. As a result, virtually all dog breeders are especially concerned with CHD, particularly if they raise larger breeds of dogs which are more frequently afflicted with the disease.

There have been a number of attempts to determine whether any therapy or dietary changes could reduce the incidence or lessen the severity of CHD. Indeed Ralston itself conducted exploratory research in the 1960's on the effects of diet on CHD, but failed to find that diet and nutrition had a mitigating effect on CHD.

Vitamin and mineral supplements have been tested, but without success. In the late 1970's, Dr. Richard Kealy, Ralston's Manager of Pet Nutrition Research, conducted limited tests of the effect of Vitamin C on CHD. Dr. Kealy concluded that this research failed to demonstrate that Vitamin C had any beneficial effects.

Reducing a dog's caloric intake, thereby reducing the dog's growth rate, has also been suggested as a way to prevent or reduce the severity of CHD. However the research conducted on that theory is still inconclusive.

### The Anion Gap Theory

The anion gap theory, the basis for Ralston's CHD and Hip related claims, was first proposed by Dr. Kealy in about 1980. The anion gap is the difference between a dog food's chloride content and the combined amount of the food's sodium and potassium content. The anion gap level of a puppy food ranges from a "superior" low level of approximately 7, to a "marginal" middle level of about 25, to a "poor" high level of up to 40. The studies conducted by Dr. Kealy, which were used to support Ralston's claims, tested puppy foods with anion gap levels in each of these three ranges. The theory postulates that the lower the anion gap level in a dog food, the better the formation of a hip joint in terms of reduced joint laxity and snugger fit. In turn, the reduction in hip joint laxity lessens the severity of both CHD and degenerative joint disease. In order to test his theory, Dr. Kealy conducted a series of

1249, 1282 (D.C.Cir.1984). A greater probability of the results occurring by chance would generally render the results "not significant." Although the finding that Ralston's research lacks statistical significance is not dispositive of whether Ralston's research supports its CHD claims, it is a significant factor in that determination.

experiments, identified as Trials I through VII.

### Trials I Through IV

The first four trials relied upon by Ralston were conducted by Dr. Kealy. He was assisted by Dr. Dennis Lawler, the Resident Veterinarian at the Ralston Animal Research Facility. The first two trials, started in 1980, were considered "preliminary experiments" by Dr. Kealy. Trial I was conducted on puppies six weeks of age, and Trial II was conducted on puppies who were 31 weeks of age. Both trials ran 24 weeks and tested three diets with low, medium, and high anion gap levels. The puppy litters were split into three groups, and each group was put on a different diet. At the end of the tests, each puppy was put under general anesthesia, and its hips were radiographed. These radiographs were examined, and the Norberg angle [7] of each hip was measured and compared to the Norberg angles of the other puppies in the test.

Trial I began with pointers, Labrador retrievers, and one litter of St. Bernards. The Labrador retrievers were taken off the test when some fell ill from the high anion gap diet. At 30 weeks, the final Norberg angles of the hips of the 22 remaining puppies were rated on a scale of 1 to 5, with 5 being the best hip joint fit. Dr. Kealy reported that the difference in the average Norberg angle score between all of the dogs on the low anion gap diet and all of the dogs on the medium anion gap diet was two-tenths of a rating point. This difference was reported in the research monograph as "N.S.", meaning not statistically significant. [8]

Trial II used only St. Bernard puppies and measured the effect of the three diets on puppy hip joint development between 31 and 43 weeks of age. The results of this trial compared the average change in the hip scores (as opposed to the comparison of average hip score in Trial I) of each of the diet groups. The difference between the average change in the hip score of the low and medium anion gap diets was again two-tenths of a point. These results were reported as not statistically significant. Trial II was later dropped completely from Ralston's analysis because that test involved older dogs not comparable to the dogs used in the other trials.

The next two trials, according to Dr. Kealy, constituted the commercial phase of Ralston's research. Trial III began in June 1981. This was the first trial to test commercial puppy food diets: a specially reformulated version of Ralston Hero Puppy food with a low anion gap of 8, the standard version of Ralston Hero Puppy Food with a medium anion gap of 18, and Cycle I Puppy Food with a medium anion gap of 27. No dog food with a high anion gap was tested. Trial III employed St. Bernard puppies over a 24 week period, beginning at 6 weeks of age. The differences in average hip scores between the three groups were not statistically significant.

After Trial III was concluded, Dr. Kealy testified he conducted reproductive and growth tests under protocols issued by the Association of American Feed Control Officials ("AAFCO") [9]. The growth test became known as Trial IV. Dr. Kealy considered this test a continuation of the commercial phase of Ralston's research of its low anion gap diet.

Trial IV used 30 pointers and 6 American coonhounds to test three diets: commercially available Beef Flavored Puppy Chow with a medium anion gap of 23 and two specially formulated versions of Beef Flavored Puppy Chow with low anion gaps of 7 and 8 respectively. The trial examined

---

7. The Norberg angle is a static measurement of a radiograph of the fit of the hip ball and socket in a particular position (leg extended), while a certain degree of stress is applied to the leg of an anesthetized dog that is lying on its back.

8. There was no significant difference between the hip scores of puppies on the medium and high anion gap diets.

9. AAFCO is an association of state and federal regulatory officials who, with the cooperation of the pet food industry, set standards and approve labels for pet foods. If Ralston created a low anion gap Puppy food with a superior CHD profile and it passed the growth test, it could be labeled a "complete and balanced food for all puppies."

puppies over a 24 week period, from 6 to 30 weeks of age. Only the Norberg angle measurements of the dogs were reported. No hip scores were reported. The results of this trial were reported as not significant in the Ralston monograph. In some instances, the Norberg angle scores of the puppies on the low anion gap diet of 8 were worse than the scores of the puppies on the medium anion gap diet. Trial IV was concluded in March 1983. No further trials were conducted for almost two years.

Using the results of these four trials, Ralston drafted a research monograph which claimed that this research substantiated the anion gap theory and Ralston's CHD claims. Since the separate trials failed to produce significant results, Ralston claimed that

> Pooled data from all four trials combined demonstrated a significantly ... reduced hip joint laxity due to [superior] CHD nutrient profile.

The monograph served as the basis for Ralston's claims that its dog food could reduce hip joint laxity and lessen the severity of CHD. Omitted from Ralston's analysis was any reference to Trial V, discussed *infra.*, a test which completely discredited the basic premise of the anion gap theory.[10]

The evidence and expert testimony presented at trial and credited by this court indicate that the results of the four trials cannot properly be pooled, and that even if the results from all relevant trials were properly pooled, they did not produce significant results.

Ralston consulted a number of independent CHD experts prior to making its CHD claims. Both Drs. E.A. Corley and George Lust warned Ralston that more research was needed to confirm the anion gap theory. Dr. Corley, whose testimony this court credits, considered the data from the four trials in the monograph to be inadequate and not statistically significant. He found the monograph lacking in pathological data, which he felt was critical in determining the presence of CHD and proper joint

formation. He advised Ralston that before Ralston made any public CHD claims, a long term, multi-year study was needed to confirm the anion gap theory. A third expert, Dr. William E. Blevins, head of radiology at the Purdue University School of Veterinary Medicine, was also consulted by Ralston. He told Ralston's researchers, Drs. Kealy and Lawler, that the Norberg angle was not an accurate measure of hip joint laxity.

In September 1984, after Trial IV had been concluded, Dr. Kealy conferred with the Ralston marketing officials about his anion gap theory and its possible benefits. He told them that many more months of tests were required to confirm the results of the initial tests. Kealy said that he wanted to see the effects of a low anion gap diet in adult dogs before Ralston made any CHD claims. The marketing people ignored Kealy's request that Ralston proceed with caution and started to prepare a marketing plan to push its CHD claim.

*Trial V*

While the earlier tests (Trials I–IV), when pooled, were offered to demonstrate the beneficial relationship between a low anion gap diet and hip joint laxity, they failed to confirm any beneficial relationship between the anion gap diet and the frequency and severity of CHD. Radiographic diagnoses of dogs under one year of age often fail to recognize diseased hips, since CHD cannot be diagnosed conclusively until a dog reaches maturity.

To remedy these problems and confirm the conclusions reached from the first four tests, Trial V was designed as a long term test of the effects of the low anion gap diet over a period of nearly three years. Its existence was not disclosed until discovery in this trial. Thirty-three Labrador retrievers were used in Trial V. Labrador retrievers are a large breed of dog that are known to have a high incidence of CHD. The design of Trial V was similar to earlier Ralston Trials. Three diets with low, medi-

10. This court finds that data from Trial V was improperly excluded from Ralston's "pooling" of data. Trial V was designed as a long term test with a planned duration of two to three years.

um, and high anion gap levels were fed to puppies over the length of the test.

In October 1985 the radiographs taken in the 20th week of Trial V indicated that the hips of the puppies on the low anion gap diet were deteriorating. Those puppies developed the worst Norberg angle measurements, while those on the medium anion gap diet developed the best Norberg angle measurements. These results were completely inconsistent with and contrary to the anion gap theory and Ralston's claims. The results at 33 weeks only confirmed these negative results. In November 1985, while the CHD advertising campaign was underway, Dr. Kealy terminated Trial V.

The court notes with great concern Ralston's conduct during these proceedings. In a declaration filed with this court in opposition to ALPO's motion for a preliminary injunction, Dr. Kealy stated, "In all, four trials were performed under carefully controlled conditions." No reference at all was made to Trial V. The declaration was false. At the time the document was filed, Trial V had been terminated and Trial V–A [11] was being conducted. There was a similar failure to disclose the results of Trial V on the part of two other Ralston employees: Dr. Dennis Lawler, a Ralston researcher, and Robert Mohrman, Director of Pet Nutrition & Care Research. Both failed to mention the existence of Trial V and V–A in their declarations despite having full knowledge of these tests.

*Trials VI and VII*

Two other tests were conducted by Ralston, Trials VI and VII. The court finds neither relevant in its determination of the veracity of CHD claims, since Trial VI was not designed to support Ralston's CHD claims and the results of Trial VII were not available at the time the claims were made.

Trial VI, begun in April 1985, used 36, six week-old Labrador retrievers and coonhounds. Based on the testimony of Dr. Kealy and Dr. Bebiak, manager of Ralston's Pet Nutrition Services, the test was not intended to be a CHD test and was not relied upon by Ralston in making its claims. Thus, even if its results were available at the time any of the CHD claims were made, they are not material to a determination of the false or misleading character of those claims.

Trial VII was started in December 1985, after the monograph had been prepared and distributed and well after the CHD advertising campaign had reached full force. It was originally designed to last one year, finishing well after Ralston had halted the CHD campaign.

The trial used pointer and German shepherd puppies. It tested three formulations of Puppy Chow, two with low anion gaps of 11 and 12 respectively, and one with a high anion gap of 37. The study is now a long term, five year study similar to the initial proposal for Trial V. The test was still ongoing at the end of this litigation. The preliminary results of this test were not statistically significant.

The court is mindful of Ralston's attempts to enlist the results of Trial VII to support its CHD claims. Given the court's reasoning as to what constitutes relevant evidence in this factual inquiry, such efforts are in vain. It is not the role of this court under the Lanham Act to determine whether clinical research will eventually support the challenged claims, but whether the claims were supported by clinical evidence available at the time they were made.[12]

---

11. Trial V–A, a continuation of Trial V, was started with the puppies from the aborted Trial V. It continued for about two years. The radiographs of Trial V–A were never examined and no summary of its results has been done.

12. In an action for false advertising, claims which are unsubstantiated when made cannot be salvaged with after-the-fact clinical support. The Lanham Act prohibits claims that are false or misleading *at the time they are made.* Post facto evidence cannot make actionable true claims which later become false and does not bar suits for false or misleading representations which later become true. To do so would undermine the policy behind § 43(a) of the Lanham Act in prohibiting companies from making unsubstantiated claims in order to influence the purchasing decisions of the buying public. However, such evidence of the truth of a challenged representation could be relevant to other aspects of a claim.

Even if the results of Trial VII were considered, the court finds they were not statistically significant and in certain respects they directly contradict Ralston's claims. Indeed, examination of Trial VII results show that the hips of the German shepherd puppies who consumed Puppy Chow diets with low anion gaps deteriorated during the testing period. The testimony of Dr. Douglas Robson, which this court credits, shows that when the results of Trial VII are pooled with the other similar trials (I, III, IV and V), the results are not statistically significant and thus Ralston still lacks support for its claims.

*Ralston's Research Methods*

This court finds that inadequacies in the design and execution of Ralston's research were so substantial that the data gleaned from the tests are not valid. This finding is based on the court's evaluation of the design of the CHD research, the methods used in conducting the trials, the inability to explain how the anion gap formula affects hip joint formation, the objectivity and skill of the persons conducting the tests and their concerns that the research did not adequately support the claims made by Ralston.

Particularly significant is the fact that the tests were not conducted over an adequate time period to establish any impact of Puppy Chow on hip joint development. Although Ralston's claims extend to the first two years of a dog's life, most of the animals relied upon were observed only during their first seven months of development. Other research conducted in the field of CHD shows that false negative radiographic diagnoses in puppies at six months can be as high as fifty percent, and as high as twenty-five percent in dogs up to one year of age. Moreover, the Orthopedic Foundation for Animals will not rely on radiographic diagnoses of dogs under two years of age due to such inaccuracies.

Ralston was notified of this fact before the publication of its CHD claims.

Ralston did not have proper test animal selection. The dogs selected were not those commonly used in CHD testing, for which extensive testing information is available. When Ralston did use dogs commonly used in CHD testing, Labrador retrievers and German shepherds, Ralston either discounted those tests or failed to test in large enough numbers to produce significant test results. Indeed the results from the tests on those breeds, particularly Trial V, show that the low anion gap diet had either no effect or a negative effect on hip joint laxity and development.

Ralston's research lacked control over variables. Experts for both parties testified that when testing the effect of anion gap levels on hip joints, nothing should have varied in the diets except the anion gap levels. However as noted by Both Dr. Corley and Dr. Bebiak, a Ralston researcher, the base diets in the trials were not held constant, so that considerably more than the anion gap levels varied between diets.

None of the trials tested any of the Puppy Chow brands for which the claims were made. Ralston failed to test the actual formulas used in Puppy Chow products, and only two of the studies, trials V and VII, actually tested a formula similar to those included in Puppy Chow products. Moreover, later reformulations of Puppy Chow to improve its palatability and digestibility were never tested to see what effect those changes in formula might have on hip joint development.

Ralston employed the Norberg angle as the sole measure of the effect of the low anion gap diet on puppies' hip formation.[13] That practice was criticized by a number of experts as inaccurate and not reproducible.

Both Drs. Corley and Blevins thought it was inaccurate, and Dr. Blevins alone stated it was not sufficiently reproducible to be

---

**13.** The Norberg angle measures how tightly the head of the femoral bone fits into the socket of the thigh when the leg is extended. The measurement is taken from hip radiographs of anesthetized puppies, where the puppy is placed on its back and the hind legs are extended manually. The Norberg angle is the angle between a line drawn between the two femoral heads and a line drawn between the center point of the femoral head of the particular thigh joint (right or left) being measured and the rim of the hip socket the femoral head fits into.

satisfactory. Ralston's own expert, Dr. George Lust, testified that the Norberg measurement is of questionable effectiveness in measuring borderline cases, the very cases Puppy Chow claimed to ameliorate. The court also points to the published statement of Dr. Lust that radiographic diagnoses made on dogs younger than one year often fail to identify dysplastic dogs, since dysplasia often does not develop until the dog reaches two years of age.

Ralston researchers failed to employ more established and more accurate methods of determining the presence and degree of joint laxity or CHD: pathological examinations of the hip joints during a necropsy, radiological examinations of the hip joints by board certified radiologists, or palpitation of the hip joint.

The most accurate and accepted method of detecting and evaluating the severity of CHD is by conducting a pathological examination of the actual hip joint, after the dog has died. Surprisingly, while the majority of the dogs used by Ralston in its research were sacrificed and necropsies were performed, no pathological studies of the hip joints were conducted.

The accepted method of diagnosing CHD in live dogs is by radiographic examination. The radiographic method most frequently employed is that used by the Orthopedic Foundation for Animals ("OFA"). First, radiographs of a dog's hips are sent to the OFA, which in turn sends them to three board certified radiologists for analysis and evaluation. Each radiologist makes a diagnosis as to whether the hips are normal or diseased, and rates each hip according to the degree of normality or disease. These separate evaluations are based upon the subjective comparison by the radiologist of the hip with the normal hip configuration of the breed being examined. When all three opinions are received at the OFA, a fourth board certified radiologist screens the information received and determines if there is a consensus as to whether the hips are normal or diseased.

The OFA, a leading organization in the field of radiographic diagnosis of CHD, does not regard as totally reliable any radiographic analysis showing normal hip joints on dogs less than two years of age, due to the fact that CHD may not appear in dogs until they reach two years of age. By contrast, the vast majority of puppies whose radiographs were relied upon by Ralston were less than eight months of age, and none of the radiographs were taken by board certified radiologists.

A third method of detecting hip joint laxity and CHD is by palpitation of the hip joint. Palpitation is part of the standard clinical examination to determine hip joint laxity or CHD that might not be detected in a radiographic examination.

Yet despite the wide use of all of these methods, apparently none were used by Ralston in its research. Instead, Dr. Kealy employed a method that is not used or endorsed by any established CHD research organization or expert in this country.

Researchers failed to explain consistently or sufficiently how the anion gap diet affects hip joint development. The biochemistry values reported for Trials I through IV—synovial fluid values, urine values and blood serum values—were inconsistent from trial to trial. Indeed, Ralston researchers often failed to measure these values in each of the trials. This is significant in that these values were used by Dr. Kealy to explain the mechanism by which the anion gap levels affected joint formation, an explanation which changed from trial to trial. In the monograph Dr. Kealy identified urinary hydroxyproline excretion as being most relevant to the effect of the low anion gap on hip joint laxity and CHD. However, this value was not reported in Trial IV, and varied significantly among the remaining tests. Moreover, none of these biochemistry values was considered significant by those experts who reviewed the research.

The objectivity and skill of those conducting the tests is also a factor in the court's determination. Dr. Kealy, who conducted and supervised Ralston's CHD research, spent very little of his professional life in CHD research. None of the papers authored by Dr. Kealy, with the exception of Ralston's promotional research monograph,

concern CHD. Only three relate to dogs: two concerning calcium metabolism and one on the evaluation of a dog's coat of hair. Additionally, Dr. Kealy, as an employee of Ralston, had a strong interest in seeing that the research conducted supported the anion gap theory, especially since a good portion of the research was performed while market planning for the formula was already underway.

This court also draws attention to Dr. Kealy's written concerns that the research did not support the advertising claims made. These written concerns were intentionally suppressed by his superior, Mr. Mohrman, who instructed Dr. Kealy to destroy all written expressions of concern about Ralston's CHD claims and never to put such concerns in writing. Dr. Lawler expressed similar concerns and was given similar instructions by Mr. Mohrman.

These actions raise serious questions regarding the intentional destruction of evidence, since Mr. Mohrman's expressed reason for directing the destruction of these documents was his concern that they might be used against Ralston in litigation. That Ralston researchers expressed concerns that the trial results did not support the advertised claims both reinforce this court's findings and undermine the testimony of Ralston employees to the contrary.

### Statistical Analysis

This court finds that Ralston researchers excluded certain trials from consideration, the results of which directly contradict Ralston's CHD claims. Further, the court finds that the data from the Ralston trials lacked the requisite statistical significance to render them reliable.

What emerges from the record are the following facts: (1) the results of each of the first four trials taken by themselves are statistically insignificant, (2) Trials I–IV were improperly pooled, since the tests varied significantly in design and execution, (3) the results of Trial V were wrongly excluded from the statistical analysis, and (4) when the results of Trial V are pooled with the results of Trials I, III, and IV, the resulting data is statistical-

ly insignificant and does not substantiate Ralston's CHD claims.

The results of the four trials used by Ralston to support its CHD claims were not by themselves statistically significant, and therefore none of them lend any real support to the CHD claims. Ralston's own expert biostatistician, Dr. Ronald Helms, admitted that none of the trials conducted by Ralston produced statistically significant results.

Ralston's pooling of Trials I through IV to obtain statistically significant results is unacceptable. Expert witnesses for both parties agreed that Trial II should not have been included because the dogs tested were older (31 weeks) than the puppies in the other three tests (6 weeks), and the test only ran for 12 weeks, as opposed to 24 weeks for the other three tests. In addition, the test diets for Trial II, although identical to Trial I, were substantially different than the commercial diets used in Trials III and IV.

The results of Trial V should not have been excluded from Ralston's analysis. The testimony of Dr. Corley and Dr. Robson are credited on this point. The justification provided by Drs. Kealy and Helms as to why Trial V was excluded is unconvincing and contrary to the weight of the credible evidence. The data from Trial V is significant. Trial V was the first test to make substantial use of the dog breed most often used in CHD research, Labrador retrievers. Dogs from the same sire were chosen to reduce the effects of genetic variability on the trial. Trial V procedures parallelled those of I, III, and IV. Although these results were initially found by Ralston to be statistically significant, they were not pooled and were not released to anyone outside Ralston despite Ralston's clear duty to submit such data to governmental and quasi-governmental regulatory agencies and its duty to disclose such data to this court at the early stages of these proceedings.

It is clear that when Trials I, III, IV and V are pooled the results are not statistically significant. Moreover, even if all the trials except Trial II (which both parties

agree must be excluded) were pooled, the results would be inconclusive.

The overwhelming weight of credible scientific authority disputes Ralston's claim that its Puppy Food diet may retard the formation of CHD. The only support for the challenged advertised claims are tests which were poorly designed and conducted, whose data even in its most favorable light fails to be statistically significant. Thus, it is clear that Ralston's CHD claims are false under § 43(a) of the Lanham Act. Ralston's selective use of data from only four of Ralston's trials and the highly suspect manner in which the trials were organized and conducted further support the court's finding.

*The Materiality of Ralston's CHD Claims*

There is ample evidence that Ralston's CHD claims are material. The extensive planning of the campaign, the considerable prepublication review of the "effectiveness" of the claims, Ralston's own enthusiastic support of the campaign and its evaluation of the success of the campaign clearly evidence this finding.

Ralston conducted extensive prepublication review of its CHD claims and decided to publish those claims only after evaluating the effect of the advertisements on consumer focus groups. Its preliminary surveys show that Ralston clearly intended that its CHD ads exert a substantial effect on consumer purchasing decisions. The focus group evidence showed that the target audience considered the claims to be important, attention getting, and relevant to the health of dogs. The research also showed that consumers exposed to the claims would favorably consider buying Puppy Chow products.

The trial record includes testimony that certain Puppy Chow purchasers, who upon being exposed to Ralston's claims, switched or purchased Puppy Chow products expressly because of the Ralston claims. Ralston's own favorable assessments of its CHD campaign show its materiality. Ralston's Vice–President for Dog Food Marketing admitted that before and during the CHD campaign, Ralston considered the concept to be a "very viable product improvement," especially to professional audiences. Ralston's internal documents, prepared before this suit was filed, praised the success of the CHD campaign. Those documents acknowledge that the CHD claims were successful in favorably impressing veterinarians. Ralston memoranda hailed the CHD Campaign as a success, attributing Ralston's preservation of its market share in part to the marketing and advertising of Ralston's CHD Puppy Food.

Testimony of economic experts for both sides have shown that Ralston's CHD campaign was effective. Regression analyses conducted by Dr. Bruce Owen, whose testimony is credited by this court, indicate that there is sufficient evidence to show Ralston's CHD campaign was above average in effectiveness. This determination is supported by Ralston financial data during the period in which the campaign was conducted. Puppy Chow reached record levels in sales and profits during this time. The tonnage-shipped to grocery and general merchandise outlets increased at a relatively constant pace.

This evidence is significant for a number of reasons. During the CHD campaign the puppy and dog food markets were flat or decreasing in terms of new dog owners. Moreover, a number of new competitive products appeared on the market at this time which increased dramatically the level of competition in the puppy food market. Thus, the increase in Puppy Chow's sales during this time was achieved at the expense of its competitors, including ALPO.

As a result of the above, ALPO has sustained its case against Ralston. I shall now turn to Ralston's claims against ALPO.

*ALPO's Veterinarian Preference Claims*

For its part, ALPO has also made certain advertising claims it cannot support. ALPO's representations that veterinarians preferred its "formula" for Puppy Food "2 to 1" over that of other leading brands, and particularly over that of the leading puppy

food are false, misleading, and deceptive.[14]

Beginning in September of 1985, when it began marketing its newly formulated puppy food product, ALPO claimed that veterinarians preferred the "formula" for its puppy food over that of the leading puppy food. The claim was made in television advertisements, in consumer magazines, in trade advertising, in direct mail flyers, in point of sale materials, and on its Puppy Food product labels. The challenged claims that compare ALPO puppy food directly with the "leading brand," Puppy Chow, began at the same time that Ralston started its CHD campaign. ALPO ceased making the majority of these claims in October of 1986.[15]

*Impact of ALPO's Claims on the Audience*

Although the carefully parsed, literal claim states a formula preference, this court finds that the message carried away by consumers exposed to the ad is one of brand preference. In making this finding, the court credits the surveys conducted by Ralston. In those surveys the overwhelming majority of consumers exposed to the claims took away the message that ALPO dry puppy food was superior to the "leading" puppy food.

Surveys conducted by both Ralston and ALPO show that a substantial number of consumers interpreted ALPO's formula preference claim as a brand or product preference, claim. In the first of two marketing studies conducted by ALPO, twice as many consumers interpreted the claim as a brand preference, as opposed to a formula preference. In the second study, a brand preference was taken away by a margin of 14 to 1. The percentage of consumers who took away a product preference message was even greater. Similar results were reached in Ralston's surveys.

*Support for ALPO's Claims*

Considering ALPO's veterinarian preference claim against the undisputed fact that veterinarians' overwhelmingly preferred Purina Puppy Chow, this court finds that ALPO's veterinarian preference claim was deceptive and misleading. The design of the surveys upon which ALPO bases its veterinarian preference claims were flawed. ALPO's surveys presupposed that veterinarians were given sufficient information with which to formulate a meaningful choice. However, the information on which veterinarians made their preference was misleading and incomplete.

The various puppy food products on which veterinarians based their formula preference were not the actual proprietary formulas of the different products. Instead, the veterinarians in the survey were asked to make their choice based on a list of ingredients setting forth the amounts of protein fat, fiber, and moisture content as well as in certain instances, the caloric density and digestibility percentages. Such information is insufficient for a nutritional expert to make a meaningful choice among dog foods. The institutional experts who testified stated that information essential for a meaningful choice must also include whether a food is complete and balanced, the calcium and phosphorous levels of the food and the quality control measures employed by the manufacturer.

ALPO canned and dry puppy foods were advertised as having a single formula when they actually had different formulas. Veterinarians were unable to designate whether they preferred the wet or dry version of ALPO puppy food since both versions were lumped together as a single choice.

ALPO indiscriminately used the results of its survey that veterinarians preferred ALPO puppy food over that of Purina Puppy Chow dry food. ALPO's veterinarian surveys compared the combination of ALPO's *wet* and *dry* puppy formulas against the single dry formula for Puppy Chow. When, however, ALPO announced

14. In discussing ALPO's vet preference claim, little distinction is made between the general veterinarian preference and the "2 to 1" characterization of that claim with the exception of the court's analysis of ALPO's substantiation of its "2 to 1" ratio, *infra.*

15. Some formula preference claims were continued into 1987, and packaging containing the veterinarian preference claim was on store shelves until spring of 1988.

the results of its surveys, it suggested that the comparison was between ALPO and Ralston's *dry* puppy foods.

ALPO's preference survey results dated May 1986 show that ALPO lacked substantiation for its "2–to–1" preference claim. This was known to ALPO long before it took any action to stop publication of that claim. Internal ALPO documents, prepared in June of 1986 acknowledged that it could no longer sustain its "2–to–1" preference claim, even under its own analysis of its survey results. Even with this information, the challenged claim continued to be made in television advertisements until November 1986, and was included on ALPO's 25 lb. bag of puppy food until late February 1987.

*ALPO's Intent*

ALPO clearly intended that its formula preference claim be the focal point of its competitive "head to head" contest with Ralston Puppy Chow. ALPO's preference claim was designed to show a brand or product preference. ALPO officials were fully aware that veterinarians overwhelmingly preferred Purina's products, principally because of their established reputation in the field. With this in mind, ALPO designed its survey to facilitate the making of a brand or product preference claim.

Thus, ALPO officials intended that the formula preference claim be its central message in their advertising campaign. ALPO's own documents described the formula preference claims as, among other things, ALPO puppy food's "reason for being."

*The Materiality of ALPO's Claims*

ALPO's "formula preference" advertising and labeling, particularly concerning its "2–to–1" claim, were clearly material. A majority of the consumers exposed to the TV advertisements described the "2–to–1" representation as the main message of the commercial. In four studies conducted on behalf of ALPO, one involving the "2–to–1" label claim and three involving the "2–to–1" television claim, significant percentages of the consumers who participated found the claim important and believable.

Consumer survey studies conducted on an ALPO television commercial revealed that over eighty percent of those who viewed the commercial found the "2–to–1" veterinarian formula preference claim important in making their Puppy Food purchases. Sixty-seven percent of the consumers in the study found the claim to be believable. ALPO's study of the effectiveness of bag labeling containing the "2–to–1" formula preference indicated that 77 percent of those interviewed found the claims to be important. Its own continuous tracker surveys show that 69 percent of those people exposed to the veterinarian preference claim believed ALPO Puppy Food was the brand veterinarians preferred.

Thus, it is clear that ALPO's formula preference claims were believable, important, and likely to influence consumer purchasing decisions. ALPO's own assessment of the commercials was that they were effective in influencing consumer purchasing decisions. ALPO's own long range marketing assessment refers to the veterinarian preference claims as possessing "proven consumer impact."

*The Digestibility Claims of Both Parties*

Both parties have alleged that its opponent's claims of "superior digestibility" amount to false and deceptive advertising. This court finds that neither party has sustained its burden on these allegations to justify an injunction or an award of damages.

*8–to–1 Claim*

ALPO has also alleged that Ralston's claim that Puppy Chow is "recommended 8 to 1 over any other puppy food by veterinarians" is false and deceptive. The court does not find that ALPO sustained its burden on this claim.

*ALPO's Defamatory Statements*

█ Ralston alleges that ALPO conducted a publicity and lobbying campaign directed against Ralston's reformulated Puppy Chow that constituted defamation. Because of the court's finding that Ralston's puppy food claims were false and misleading, ALPO's public statements can in no

manner give rise to a cause of action based on defamation.

*Monetary Relief*

The court finds that ALPO was damaged by Ralston's misconduct. Dog owners would certainly be remiss in caring for their dogs if they did not feed them a chow that would substantially lessen the possibility of their pet contracting CHD. Based on the materiality of Ralston's CHD claims and the economic analysis by both parties of the success of the CHD campaign, the court finds that ALPO Puppy Food lost sales to Puppy Chow on account of the CHD claims.

The court finds that ALPO spent a substantial amount of money in advertising expenditures in order to counter the CHD campaign, an amount over and above its planned advertising costs for ALPO Puppy Food. Moreover, the court finds that plaintiff had to postpone the introduction of its new puppy food on a nationwide basis, and finds the delay was due in part to ALPO's difficulty in overcoming the extravagant and false claims made by Ralston.

A particularly effective way to measure the damages sustained would be to look to the sums Ralston expended in its CHD advertising campaign. That amount was 5.2 million dollars.

During the 1986 fiscal year, the approximate period in which Ralston made its CHD claims, Ralston earned 171.6 million dollars in sales from Puppy Chow products. When this figure is reduced by the appropriate production and sales costs, Ralston's profits (pre-tax) come to 50.1 million dollars for the period.[16] The amount of Ralston's profits corresponding to ALPO's share (22 percent) of the non-Ralston puppy food market is 11 million dollars.

Ralston has maintained the validity of its CHD claims and unless enjoined would renew making them once this case has been concluded. It is also clear the CHD claims have made a lasting impression on the audi-ences to which they were directed. Thus, there is evidence of continuing injury to competitors, veterinarians, breeders, and dog owners who were exposed to the CHD claims.

The court does not find that Ralston is entitled to an award of damages based on ALPO's misconduct. Ralston, as a competitor, and the consuming public are in need of protection from ALPO's false and misleading advertisements of its puppy food. The court believes that such protection can best be accomplished by enjoining ALPO from engaging in false and deceptive advertising of its puppy food.

## CONCLUSIONS OF LAW

■ Section 43(a) of Lanham Act provides in relevant part:

> Any person who shall affix, apply, or annex ... any false description or representation, including words or other symbols tending falsely to describe or ... represent the same, and shall cause such goods to enter into commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). The act creates a cause of action for representations and statements that are (1) facially false, (2) affirmatively misleading, (3) untrue due to a failure to disclose information, and (4) partially correct and literally true but convey a false impression. *See U–Haul Int'l, Inc. v. Jartran, Inc.,* 601 F.Supp. 1140, 1149 (D.Ariz.1984), *aff'd in part and rev'd in part,* 793 F.2d 1034 (9th Cir.1986).

■ While the Act is not directly available to consumers, it is nevertheless designed to protect consumers, by giving the cause of action to competitors who are prepared to vindicate the injury caused to consumers. *Gold Seal Co. v. Weeks,* 129 F.Supp. 928 (D.D.C.1955) *aff'd sub nom. S.C. Johnson & Johnson & Son, Inc. v. Gold Seal Co.,* 230 F.2d 832 (D.C.Cir.1956),

---

**16.** Contrary to Ralston's arguments and in the absence of any mitigating circumstances, taxes are not a proper deduction in determining profits under § 35 of the Lanham Act. *See Wolfe v.*

*National Lead Co.,* 272 F.2d 867 (9th Cir.1959), *cert. denied,* 362 U.S. 950, 80 S.Ct. 860, 4 L.Ed.2d 868, *rehearing denied,* 363 U.S. 809, 80 S.Ct. 1235, 4 L.Ed.2d 1151 (1960).

cert. denied, 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956); *Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777 (N.D.Ill.1974); *Johnson & Johnson v. Carter Wallace, Inc.*, 631 F.2d 186 (2d Cir.1980) (a broad range of parties entitled to relief).

The Lanham Act provides a private right of action against a merchant's misleading description of its product either by itself or when compared to its competitor's product. *See Gold Seal Co.*, 129 F.Supp. 928; *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649, 651 (3d Cir.1954); *see also McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34 (2d Cir.1988). In the instant case both parties are direct competitors in the puppy food market, and as such clearly have standing to sue under the statute. 15 U.S.C. § 1127.

■ In order to prevail on a false advertisement claim under the Lanham Act, a plaintiff must prove:

(1) the advertisements at issue are false or misleading and the advertisements actually deceived or had the tendency to deceive a substantial segment of the audience,

(2) the deceptive or misleading portions of the advertisement were material, in other words they were likely to influence the purchasing decision,

(3) defendant caused the advertised goods to enter interstate commerce, and

(4) plaintiff has been or is likely to be injured either by direct diversion of sales from itself to defendant or by lessening the goodwill or acceptability its products enjoy with the buying public.

*See Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777, 783 (N.D.Ill.1974); *U–Haul Int'l, Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1243 (D.Ariz.1981), *aff'd*, 681 F.2d 1159 (9th Cir.1982).

In this action all the allegedly falsely advertised goods, Ralston's Puppy Chow products and ALPO Puppy Food, have entered interstate commerce.

*Ralston's CHD Claims*

■ A product claim is false under the Lanham Act if the representation cites tests or other authority that does not substantiate the claim made; that is if the false substantiation is part of the representation. *See American Home Prod. Corp. v. Johnson & Johnson*, 577 F.2d 160 (2nd Cir.1978). A representation purportedly supported by clinical research may be deemed false if it is shown that the tests referred to were not sufficiently reliable to permit a reasonable conclusion that the research established the claim made. *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 119 (2d Cir.1984). Representations found to be unsupported by accepted authority or research or which are contradicted by prevailing authority or research, may be deemed false on their face and actionable under Section 43(a) of the Lanham Act.

The literal message consistently communicated to the public by the Ralston advertisements and promotional materials was that Ralston Puppy Chow products help reduce hip joint laxity or help puppies develop a snugger hip joint fit, which can reduce the severity of CHD. Simply put, Ralston's claims lacked any reasonable basis in fact. Not only have such claims perpetrated a cruel hoax on dog owners, but also have severely disadvantaged Ralston's competitors who were attempting to sell their existing products and to introduce new products in the puppy food market.

The record establishes that with the exception of Ralston's own faulty research, there is no valid scientific support for the proposition that the nutritional balance in a dog's diet can affect hip joint formation, hip joint laxity, or the severity or occurrence of CHD. The overwhelming weight of scientific research indicates that hip joint laxity and CHD are hereditary in nature and are unaffected by the nutritional balance of a dog's diet. Against this background, and in view of the factual finding that Ralston's research lends no support to its claims, it is clear that they are false on their face.

Once a challenged claim has been found "actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or consumer of the product." *PBX Enterprises v. Audiofidelity Enterprises*, 818 F.2d 266, 272 (2nd Cir.1987) (quoting *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356 (S.D.N.Y.1976)); *see also American Home Prod. Corp. v. Johnson & Johnson*, 577 F.2d 160 (2nd Cir.1978).

Since this court has found that Ralston's CHD claims are actually false, their materiality thus may be presumed. This bolsters the court's earlier finding that Ralston's claims were material in fact.

*Injunctive Relief Against Ralston*

A party is entitled to injunctive relief under the Lanham Act if it demonstrates a "likelihood of deception or confusion on the part of the buying public" caused by a product's false or misleading description or representation. *E.g., Burndy Corp. v. Teledyne Indus.*, 748 F.2d 767, 772 (2d Cir. 1984). A permanent injunction may be granted where it is shown that the plaintiff and defendant are competitors in the relevant market, and the false claims were likely to injure the plaintiff. *See Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186 (2d Cir.1980).

ALPO and Ralston are direct competitors in the puppy food market. Further, the claims made by Ralston were false and deceptive, and the credible evidence shows that consumers were deceived by those claims.

The parties have raised the equitable defenses of laches and unclean hands against any prayer for relief by the opposing party.

The defense of laches bars equitable relief only where excessive delay on the part of the plaintiff in enforcing his rights under law induces a defendant to undertake substantial activities in reliance on that delay. *See McNeil Laboratories, Inc. v. Am. Home Products Corp.*, 416 F.Supp. 804, 809 (D.N.J.1976) (applied in an action for trademark infringement). The court finds no evidence of any protracted neglect in the assertion of any of the claims in this suit, nor does it find that the parties relied to their detriment on the existing delay. Thus the defense of laches is unavailable in this case.

The defense of unclean hands is available in an action brought under the Lanham Act seeking equitable and monetary relief. *American Home Products Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 590 (S.D.N.Y.1987); *see also Urecal Corp. v. Masters*, 413 F.Supp. 873, 876 (N.D.Ill.1976) (applied to a "passing off" claim). The doctrine requires that the conduct which is said to be unclean hands must relate to the "very matter in controversy." In an action for false advertising, the unclean hands conduct of the plaintiff must relate to the same product a defendant has falsely advertised. *See Ames Publishing Co. v. Walker–Davis Publications, Inc.*, 372 F.Supp. 1, 14 (E.D.Pa.1974) (quoting *McLaughlin v. McLaughlin*, 410 Pa. 1, 187 A.2d 905 (1963)). Both parties contend that the requirements for its exercise have been met, since the false claims made by plaintiff ALPO relate to the same product as the false claims made by Ralston puppy food.

In deciding whether to apply the doctrine, the court must take into account the public and the competitors' interests in preventing the proliferation of false and deceptive advertising. *Id.*, 372 F.Supp. at 14–15. The defenses may be rejected where, as is the case here, failure to grant an injunction would only increase the damage inflicted on the buying public. *Id.* Given that the worst effects of ALPO's and Ralston's conduct have been visited on the buying public, this court believes that the equitable defenses raised cannot bar relief which is necessary and in the public interest.

Based on the above, injunctive relief against Ralston is clearly warranted. But there is more. Ralston still maintains its position with respect to the viability of its CHD claims and has only halted its continued advertisement of the claims pending this court's decision. Thus, there is the real likelihood that Ralston will re-

new its CHD advertising campaign once this litigation is over. Ralston's persistence in its claims clearly evidences the likelihood of repeated future false claims and unless restrained Ralston will continue to violate the Lanham Act with its attendant adverse impact on the buying public and ALPO's business.

The court has also found that Ralston's CHD claims have left a lingering impression on veterinarians, breeders, and dog owners. As part of this court's injunctive relief Ralston shall be ordered to prepare and disseminate to those who received information concerning its CHD claims a corrective release in terms and in form to be approved by this court.

*Damages to be Assessed Against Ralston*

The Lanham Act permits the assessment of damages and the award of profits where the facts warrant. The measure of damages and profits may be assessed on a number of different bases where necessary to effectuate the purposes of the Act, which also permits the assessment of costs and allowance of attorneys' fees in appropriate circumstances. The Act allows the award of damages in an amount up to three times the actual damages proven. After considering the various measures of damages, the court finds the most appropriate measure would be one that is based on Ralston's advertising expenditures as they pertain to the dissemination of its deceptive message. This form of relief has support in the case law and would appear to be particularly appropriate here. *See U–Haul Intern. v. Jartran, Inc.,* 793 F.2d 1034, 1037 (9th Cir.1986). Ralston's offending advertisements directly injured the public and adversely affected ALPO's business both in cutting into its existing business and depriving it of the opportunity to fully introduce and develop its new puppy food on a nationwide basis.

According to the evidence presented to this court, Ralston spent approximately 5.2 million dollars on its deceptive CHD advertising program. Since this figure does not measure the full impact caused by Ralston's impermissible conduct, the court finds this would be an appropriate case to double the damage award. Accordingly, the award of damages to ALPO is in the sum of 5.2 million dollars doubled to 10.4 million dollars. This amount is close to the 11 million dollar adjusted net profits Ralston earned from the sales of its Puppy Chow products during the period of its CHD advertising program. This sum is obtained by applying to Ralston's nationwide net profits of 50.1 million dollars ALPO's 22 percent share of the non-Ralston puppy food sales.

The court is also awarding ALPO its attorney's fees limited to its prosecution of its case in chief against Ralston, along with its related costs for this phase of the proceeding.

*ALPO's Veterinarian Preference Claims*

■ In determining whether Ralston is entitled to relief for ALPO's violations of § 43(a) of the Lanham Act, this court has applied the legal guidelines set forth in its analysis of Ralston's CHD claims.

As demonstrated with Ralston's CHD claims, an advertisement can be literally false, or it can be shown to be deceptive. *Toro Co. v. Textron, Inc.,* 499 F.Supp. 241, 251 (D.Del.1980) (quoting *American Brands, Inc. v. R.J. Reynolds Tobacco Co.,* 413 F.Supp. 1352, 1357 (S.D.N.Y.1976)).

Since it is undisputed that more veterinarians prefer Ralston's Puppy Chow over ALPO's Puppy Food, ALPO's veterinarian preference claims are false and misleading. ALPO's advertisements were designed to mislead consumers into believing veterinarians preferred the ALPO brand over all other brands. Moreover, after May 1986, ALPO was clearly aware that its "2–to–1" preference claim was false, since ALPO's own biased surveys failed to show such a margin of preference among veterinarians. The court finds that ALPO's veterinarian preference claims are material in that they were likely to and did influence consumer purchasing decisions.

*Injunctive Relief Against ALPO*

■ Because ALPO conducted a deceptive campaign with respect to its new Puppy Dog Food, in order to protect competi-

tors and the buying public ALPO shall be enjoined from future violations of the Lanham Act and shall be required to issue a corrective release in terms and in a form to be approved by the court.

The issuance of an injunction is needed to protect the public and ALPO's competitors. Accordingly, ALPO will be enjoined from making preference claims unless there is an adequate basis for making such claims.

*Damages to be Assessed Against ALPO*

This court has decided not to award Ralston damages because the court does not find that ALPO's actions approach the magnitude of Ralston's misconduct. The magnitude of the wrongdoing by Ralston in comparison to that of ALPO is so much greater that a damage award would not be justified. This is especially so where, as here, an award to Ralston would in effect absolve it from its own misconduct. This is not to condone ALPO's misconduct, but only to place it in proper perspective. This court has taken into account the fact that ALPO has acknowledged its misconduct and has ceased its offending advertising program, whereas Ralston persists in its position that its thoroughly inadequate and distorted research permits it to continue to claim its dog food can ameliorate CHD. Ralston withheld vital information about its research from the public, from government agencies, and from this court, and at least one of its officials ordered that certain adverse information be destroyed. These actions cannot go unredressed. Such would clearly be the case if Ralston is permitted to annul its damages by this court issuing a damage award against ALPO.

This court has also taken into account that the charges brought by Ralston against ALPO were instituted only as an afterthought, solely to counteract the more serious charges leveled against it by ALPO. Ralston, however, shall be awarded its attorneys fees limited to its prosecution of its claim—against ALPO and the costs it incurred in pressing that phase of the litigation.

The court is particularly disturbed by its finding that the two leading manufacturers and distributors of dog food in the United States have engaged in serious, deceptive advertising practices. Because of the seriousness of these practices, the court has decided to enjoin both parties from engaging in such practices in the future.

These are my findings of fact and conclusions of law. Any finding of fact which constitutes a conclusion of law is hereby adopted as such, and any conclusion of law which constitutes a finding of fact is hereby adopted as such.

An appropriate Order will follow.

### ORDER

Upon consideration of the entire record in this case and in accordance with the court's opinion of this date, it is

ORDERED that judgment be and hereby is entered for ALPO in the amount of 10.4 million dollars; it is

FURTHER ORDERED that Ralston pay to ALPO those costs and attorneys' fees limited to ALPO's prosecution of its case in chief against Ralston; it is

FURTHER ORDERED that Ralston, its officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and hereby are enjoined from making any advertising or other related claims that are false, misleading, deceptive or made without substantiation in fact concerning the effects of Ralston Dog food products on hip joint formation, hip joint laxity, Canine Hip Dysplasia, Degenerative Joint Disease and similar conditions; it is

FURTHER ORDERED that Ralston prepare and disseminate to those who received information concerning its CHD claims a corrective release in terms and in a form to be approved by this court; it is

FURTHER ORDERED that ALPO pay to Ralston those costs and attorneys' fees limited to Ralston's prosecution of its false advertising claims against ALPO; it is

FURTHER ORDERED that ALPO, its officers, agents, servants, employees, attor-

neys and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and hereby are enjoined from making advertising or other related claims that are false, misleading, deceptive, or without proper substantiation in fact concerning veterinarian preferences and similar claims; it is

FURTHER ORDERED that ALPO prepare and disseminate to those who received information concerning its veterinarian preference claims a corrective release in terms and in a form to be approved by this court; it is

FURTHER ORDERED that within 30 days the parties are required to adopt, implement, and submit to this court procedures for assuring compliance with the injunctive portions of this Order; and it is

FURTHER ORDERED that all other requests for relief are hereby denied.

This court shall retain jurisdiction in this matter in order to assure compliance with this order and to grant such other and further relief as may be appropriate.