ALPO PETFOODS, INC., Appellee,

v.

RALSTON PURINA
COMPANY, Appellant.

Nos. 89–7181 & 89–7264.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 13, 1990.

Decided Sept. 7, 1990.

Michael L. Denger, with whom Willard K. Tom, Steuart H. Thomsen, Bruce M. Bettigole, and Lee H. Pelton, Washington, D.C., were on the brief, for appellant.

Richard J. Leighton, with whom Douglas J. Behr, Richard F. Mann, Lewis Bernstein, and Robert B. Hummel, Washington, D.C., were on the brief, for appellee.

Before EDWARDS, SENTELLE and THOMAS, Circuit Judges.

Opinion for the court filed by Circuit Judge THOMAS.

CLARENCE THOMAS, Circuit Judge:

In this case, Ralston Purina Co. and ALPO Petfoods, Inc., two of the leading dog food producers in the United States, have sued each other under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982) (amended 1988),[1] alleging false advertising. ALPO asserts that Ralston has violated section 43(a) by claiming that its Puppy Chow products can lessen the severity of canine hip dysplasia (CHD), a crippling joint condition. Ralston, for its part, attacks ALPO's claims that ALPO Puppy Food contains "the formula preferred by responding vets two to one over the leading puppy food."

---

**1.** Ralston and ALPO also made claims based on the common law of unfair competition. Because the court granted both parties relief under the Lanham Act, it did not analyze these common-law claims. *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 720 F.Supp. 194, 197 (D.D.C.1989). Neither Ralston nor ALPO has appealed this aspect of the district court's decision.

After a sixty-one-day bench trial, the district court decided that Ralston's CHD-related advertising and ALPO's veterinarian preference advertising both violated section 43(a). *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 209–11 (D.D.C. 1989). The court permanently enjoined both companies from making "advertising or other related claims" similar to those held false, and ordered both parties to disseminate corrective statements. *Id.* at 216–17. Applying section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a) (1982 & Supp. V 1987) (amended 1988), the court also awarded ALPO $10.4 million (plus costs and attorneys' fees). The court reached this figure by determining the amount that Ralston spent on its CHD-related advertising, using that amount as a measure of Ralston's benefit from the advertising, and then doubling the amount to capture the full harm that the advertising caused ALPO. *ALPO*, 720 F.Supp. at 215 (citing *U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1037 (9th Cir.1986)). Ralston, in contrast, was awarded only its costs and attorneys' fees. *Id.* at 215, 216.

Ralston appeals the district court's judgment, focusing on the court's determination that the CHD-related advertising claims were false, as well as the court's monetary award to ALPO, its refusal to award similar relief to Ralston, and its broad and expansively implemented injunction.[2] Convinced that the court properly applied section 43(a) and found facts that are not clearly erroneous, we affirm the court's conclusion that both Ralston and ALPO have violated section 43(a). On several issues concerning remedies, however, we vacate and remand. The monetary award to ALPO is an award of Ralston's profits, rather than ALPO's actual damages, yet we do not see in Ralston's conduct willful, targeted wrongdoing, which is what an award of profits requires. *See Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 641–42

(D.C.Cir.1982) (per curiam). ALPO is entitled to its actual damages, however, and we try below to clarify what an award of actual damages under section 35(a) can include. Because ALPO, too, has violated section 43(a), Ralston is entitled to any actual damages that it can prove; in a case involving a meritorious claim and a meritorious counterclaim, section 35(a) does not authorize a court to compensate only the party considered less blameworthy. Attorneys' fees, in contrast, are available under section 35(a) only "in exceptional cases," which this court has defined as cases involving willful or bad-faith conduct. Lanham Act § 35(a), 15 U.S.C. § 1117(a); *see Reader's Digest Ass'n v. Conservative Digest, Inc.*, 821 F.2d 800, 808 (D.C.Cir.1987). This case does not fall into that category, so we reverse the district court's decision to grant attorneys' fees. Finally, we instruct the district court to enter an injunction more closely tailored to the harm posed by any repeat of Ralston's false advertising.

## I. BACKGROUND [3]

### A. *Ralston's CHD-related Advertising*

Ralston manufactures and sells Puppy Chow, which, in its two versions (dry and Chewy Morsels), is the leading puppy food sold in the United States. In September 1985, Ralston changed the formula for Puppy Chow. At the same time, it began running print ads stating that the new Puppy Chow formula could reduce the laxity of (i.e., extra space in) dogs' hip joints and improve the fit of those hip joints, thereby lessening the severity of CHD. *See ALPO*, 720 F.Supp. at 196 n. 2, 198, 202 (describing CHD and explaining relationship between hip joint laxity and CHD). For over a year, Ralston directed this print advertising at veterinarians, breeders, dog enthusiasts, and others interested in dog nutrition. In addition, Ralston ran a thirty-second Puppy Chow commercial on national television

---

**2.** No. 89–7181 is Ralston's main appeal, covering the court's decision of July 28, 1989 and the associated judgment. No. 89–7264, filed three months after No. 89–7181, covers later orders implementing the injunctions against both parties. On January 4, 1990, this court granted Ralston's motion to consolidate these two appeals.

**3.** A more detailed statement of the facts appears in the district court's opinion, 720 F.Supp. at 197–211.

networks from June 1986 through October 1986, claiming that Puppy Chow "help[s] critical bone development." *Id.* at 200; *see id.* at 199–200. To at least some extent, all of the ads claimed that feeding Puppy Chow to puppies could ameliorate or prevent CHD in those puppies. *See id.* at 198–200 (quoting Ralston's direct and indirect claims regarding a Puppy Chow diet's effects on CHD).

Ralston's claims had a weak empirical basis. The hypothesis behind Ralston's CHD-related product change and advertising was the "anion gap theory" of Dr. Richard Kealy, a Ralston nutritionist. This theory holds that the smaller the difference between the chlorine content and the combined sodium and potassium content of a dog's diet, the more snugly the dog's hip joints will tend to fit. Beginning in 1980, Dr. Kealy conducted a series of studies exploring the effect of a low-anion-gap diet on dogs' hip joint fit. In 1984, results of Dr. Kealy's first four studies (Trials I through IV)[4] led Dr. Kealy to prepare a monograph that reported a connection between a low-anion-gap diet and reduced hip joint laxity. At about the same time, Dr. Kealy briefed Ralston's marketing executives on his findings, eventually leading Ralston to reformulate Puppy Chow and make its CHD-related advertising claims. In mid–1985, however, Dr. Kealy began Trial V, his first long-term study of the effects of a low-anion-gap diet. Although the parties now dispute whether the results of Trial V were statistically significant, these results undermined Ralston's CHD-related claims so much that Dr. Kealy ended the study, which he had projected would last for almost three years, after only thirty-three weeks. After reviewing Ralston's research findings and the conflicting expert opinions on those findings' statistical sig-

nificance, the district court found that the anion gap theory lacked empirical support. *Id.* at 205 & n. 12, 208–09. It therefore held that the CHD-related advertising claims were false and deceptive. *Id.* at 213.

At trial, the district court also heard conflicting evidence on the market effect of Ralston's CHD-related advertising. This evidence included surveys of veterinarians and consumers, Ralston officials' own assessments of the advertising campaign, and several expert witnesses' interpretations of data on puppy food sales and market shares. The court concluded that the challenged ads materially increased Ralston's sales and profits, and that, given the vigorous interbrand competition during the period at issue, the increases came at the expense of ALPO and other competitors of Ralston. *Id.* at 209; *see also id.* at 214 (supplementing "the court's earlier finding that Ralston's claims were material in fact" with a presumption, drawn from *PPX Enterprises v. Audiofidelity Enterprises*, 818 F.2d 266, 272 (2d Cir.1987), that actually false claims are material).

B. *ALPO's Veterinarian Preference Advertising*

Over roughly the same period covered by Ralston's CHD-related advertising, ALPO claimed in several media that veterinarians preferred "the formula" of ALPO Puppy Food over that of "the leading puppy food," Puppy Chow. The district court found no basis for this assertion, or for the additional claim, appearing on ALPO Puppy Food bags and in other media, that the veterinarian preference was "2 to 1." *See id.* at 209–11. The court therefore held that ALPO's advertising was false, material, and aimed at Ralston. ALPO has not appealed.[5]

---

4. The district court found that none of these studies, taken alone, was statistically significant at the five percent level. 720 F.Supp. at 204; *see id.* at 201 n. 6 (citing *Segar v. Smith*, 738 F.2d 1249, 1282 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985), as authority for requiring statistical significance at five percent level).

5. Several other claims ruled on below are not before us. In the district court, each company attacked its opponent's statements that its puppy food was "more digestible." *See id.* at 211. In addition, ALPO challenged Ralston's claim that Puppy Chow is "recommended 8 to 1 over any other puppy food by veterinarians." *Id.* The district court rejected all of these Lanham Act claims, and neither party has appealed this part of the decision. Finally, Ralston has not appeal-

## C. District Court's Findings and Conclusions

Relying on its findings of fact concerning Ralston's and ALPO's advertising and the effects of that advertising, the court held that both companies had made material, false claims about goods in interstate commerce, in violation of section 43(a). The court found that the likelihood of deception and injury from each company's advertising justified a permanent injunction against each company under section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a) (1982 & Supp. V 1987) (amended 1988). *See ALPO*, 720 F.Supp. at 214–15, 215–16. On the issue of monetary relief, the court found "that ALPO Puppy Food lost sales to Puppy Chow on account of the CHD claims" and that "ALPO spent a substantial amount of money in advertising expenditures in order to counter the CHD campaign." *Id.* at 212. In contrast, the court found Ralston undeserving of monetary relief because it saw Ralston as the greater

wrongdoer, *id.* at 216, because it believed that Ralston's counterclaim was "instituted only as an afterthought," *id.*, and because it concluded that an injunction against ALPO would suffice to vindicate the public interest, *id.* at 212. On the issue of attorneys' fees, the opinion includes no explicit findings supporting the partially offsetting fee awards. At a postjudgment hearing, however, the court explained that it had awarded fees in an effort "to encourage private attorneys general." Transcript of Motions Hearing at 7 (Sept. 18, 1989).

## II. DISCUSSION

### A. Holding That Ralston's CHD-related Advertising Violated Section 43(a)

 Since ALPO has not appealed, we review only half of the district court's conclusion that Ralston and ALPO both violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982).[6] As the district

---

ed the district court's rejection of its claim that ALPO's publicity and lobbying efforts constituted common-law defamation. *See id.* at 211–12.

**6.** When the conduct in question occurred, the pertinent parts of section 43(a) read:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1982). While the case was pending before the district court, however, Congress redrafted section 43(a), sharpening the section's focus on false and deceptive advertising:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> . . . . .
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteris-

tics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Trademark Law Revision Act of 1988 (1988 Act), Pub.L. No. 100–667, sec. 132, § 43(a), 102 Stat. 3935, 3946 (amending 15 U.S.C. § 1125(a)).

Revised section 43(a) took effect on November 16, 1989, more than two years after the end of the conduct challenged in this case, and more than four months after the district court issued its opinion. *See id.* sec. 136, 102 Stat. at 3948 (codified at 15 U.S.C. § 1051 note); *ALPO*, 720 F.Supp. at 198–200, 210–11 (noting the periods during which the challenged advertising appeared). Probably for these reasons, neither party has argued that the amended section controls. Even so, the question whether the 1988 amendments retroactively apply is a significant one, since it determines the very language that our analysis must follow.

At least from 1974 to 1989, courts presumed that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *see, e.g., Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1126–31 (D.C.Cir.1985) (applying *Bradley* analysis but determining that 1984 amendment to Age Discrimination in Employment Act should not retroactively apply). Recent Supreme Court cases, however, have undercut the *Bradley* prin-

court correctly stated, to prevail in a false advertising suit under section 43(a), a plaintiff must prove that the defendant's ads were false or misleading,[7] actually or likely deceptive, material in their effects on buying decisions, connected with interstate commerce, and actually or likely injurious to the plaintiff. *ALPO,* 720 F.Supp. at 213 (citing, inter alia, *Skil Corp. v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 783 (N.D.Ill. 1974)); *accord Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 208

(9th Cir.1989). Ralston challenges the court's holding that ALPO successfully proved all of these elements with respect to the CHD ads. Its key claim is that the court's legal conclusions rest on erroneous findings of fact.

In reviewing the district court's findings on the elements of ALPO's section 43(a) claim, we have no authority to weigh the evidence anew. *See* Fed.R.Civ.P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set

ciple. These decisions appear to be reviving the older presumption *against* retroactively applying statutes. In *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), a decision that struck down a retroactive rulemaking by the Department of Health and Human Services, the Court unanimously stated: "Retroactivity is not favored in the law. Thus, *congressional enactments* and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* at 208, 109 S.Ct. at 471 (emphasis added). Last Term, in a statutory interpretation case, *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* —— U.S. ——, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Court recognized that *Georgetown Hospital* diverges from *Bradley,* but avoided "reconcil[ing] the two lines of precedent ... because under either view, where the congressional intent is clear, it governs." *Id.* 110 S.Ct. at 1577; *see also id.* at 1579 (Scalia, J., concurring) (urging the Court to overrule *Bradley* and a predecessor decision). Because the *Georgetown Hospital* rule seems more faithful to the older decisions that are being interpreted in the retroactivity debate, *see id.* at 1579–82 (Scalia, J., concurring), we rely on that rule here. *See Georgetown Univ. Hosp. v. Bowen,* 821 F.2d 750, 758 (D.C.Cir.1987) ("substantive legislation will not be given retroactive effect 'unless such be "the unequivocal and inflexible import of the [statutory] terms, and the manifest intention of the legislature" ' ") (quoting pre-*Bradley* Supreme Court decisions), *aff'd,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

The 1988 Act says only when the Lanham Act amendments "become effective"; it does not say whether they apply to conduct preceding the specified date or to litigation pending on that date. 15 U.S.C. § 1051 note. This ambiguous provision does not *require* us to apply amended section 43(a) in this case. *Cf. Eldon Indus. v. Rubbermaid, Inc.,* 735 F.Supp. 786, 792–94 (N.D. Ill.1990) (pre-*Bonjorno,* post-*Georgetown Hospital* case) (district court, applying *Bradley* presumption, compared 1988 Act with original Lanham Act and 1975 amendment (both of which included explicit bans on retroactive application), found congressional intent on 1988 Act comparatively unclear, and thus decided to ap-

ply 1988 Act retroactively). Since the 1988 Act does not overcome the presumption of nonretroactivity, *see Georgetown Hospital,* 488 U.S. at 208, 109 S.Ct. at 471, we apply here the pre–1988 version of section 43(a).

That the recent changes to section 43(a) have little relevance to this case vindicates the parties' decision not to address retroactivity. Congress intended that the section 43(a) amendments largely codify pre–1988 case law. *See* S.Rep. No. 515, 100th Cong., 2d Sess. 40, *reprinted in* 1988 U.S.Code Cong. & Admin.News 5577, 5603; 134 Cong.Rec. S16,972–73 (daily ed. Oct. 20, 1988) (statement of Sen. DeConcini); *id.* at H10,422 (daily ed. Oct. 19, 1988) (statement of Rep. Moorhead). According to the legislative history, the only substantive change intended was "to make clear that misrepresentations about another's products are as actionable as misrepresentations about one's own." S.Rep. No. 515, *supra,* at 40, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 5603; *accord* 134 Cong. Rec. at H10,420–21 (statement of Rep. Kastenmeier). Yet Ralston, the sole appellant here, is accused of making misrepresentations only about its own products. *See supra* pp. 961– 63; *cf. U.S. Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 921–22 & nn. 8–9 (3d Cir.1990) (pre-*Bonjorno,* post-*Georgetown Hospital* case) (adopting *Bradley* presumption and retroactively applying extension of section 43(a) to misrepresentations about another person's goods or services, in case involving misrepresentations about a competitor's services), *petition for cert. filed,* 58 U.S.L.W. 3787 (U.S. May 25, 1990) (No. 89–1869). Therefore, even if we were to apply the *Bradley* presumption and give the 1988 Act retroactive effect, the substance of our section 43(a) analysis would remain the same.

7. In its challenge to Ralston's CHD-related ads, ALPO did not call Ralston's claims literally false; rather, it asserted that the test data supporting the claims "were not sufficiently reliable to permit a reasonable conclusion that the research established the claim[s] made." *ALPO,* 720 F.Supp. at 213 (citing *Procter & Gamble Co. v. Chesebrough–Pond's Inc.,* 747 F.2d 114, 119 (2d Cir.1984)).

aside unless clearly erroneous...."). In *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985), the Supreme Court described in expansive terms the deference that the "clearly erroneous" standard affords trial courts. Going beyond the familiar " 'definite and firm conviction that a mistake has been committed' " standard, *id.* at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)), the Court said this:

> Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.... But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.*, 470 U.S. at 575, 105 S.Ct. at 1512.

■ The above passage from *Bessemer City* squarely applies. The district court heard weeks of conflicting expert testimony on the basis for and effectiveness of Ralston's CHD-related advertising. In finding that advertising false, deceptive, material, and injurious, the court cited specific experts' testimony, sometimes crediting that testimony over other evidence. *See, e.g., ALPO,* 720 F.Supp. at 204 (crediting Dr. E.A. Corley's criticism of Ralston's research monograph on anion gap theory); *id.* at 208 ("The results of Trial V should not have been excluded from Ralston's analysis. The testimony of Dr. Corley and Dr. Robson are credited on this point. The justification provided by Drs. Kealy and Helms as to why Trial V was excluded is unconvincing and contrary to the weight of the credible evidence."); *id.* at 209 (finding Dr. Bruce Owen's regression studies sufficient to show that CHD-related advertising had a material effect). We have reviewed the record, and we cannot say that this evidence and other evidence supporting the court's view of Ralston's CHD-related

claims were incoherent, facially implausible, or contradicted by extrinsic proof. *See Bessemer City,* 470 U.S. at 575, 105 S.Ct. at 1512. Accordingly, we affirm the district court's determination that ALPO satisfactorily carried its burdens of proof and persuasion on each element of its false advertising case against Ralston.

■ In only one respect do we disturb the district court's analysis of ALPO's section 43(a) claim. As we discuss in sections (B) and (D) below, the court granted ALPO certain remedies that would be proper only in a case involving actions that evince willfulness or bad faith, such as passing off a product as another seller's product. *See, e.g., W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970) (affirming award of profits in case involving willful passing off). The district court did not explicitly state that Ralston acted willfully or in bad faith, but its choice of remedies strongly suggests such a finding. *See, e.g., ALPO,* 720 F.Supp. at 215, 216 (awarding attorneys' fees to ALPO); *see also Conservative Digest,* 821 F.2d at 808 (award of attorneys' fees to plaintiff requires a finding of willfulness or bad faith). Moreover, several of the court's findings on Ralston's conduct, taken together, reflect the court's conclusion that Ralston ran advertisements that it knew lacked support. *See, e.g., ALPO,* 720 F.Supp. at 213 (Ralston's claims have "perpetrated a cruel hoax on dog owners"); *id.* at 216 ("Ralston persists in its position that its thoroughly inadequate and distorted research permits it to continue to claim its dog food can ameliorate CHD."). In sum, the court found, without stating explicitly, that Ralston had acted willfully or in bad faith. For the reasons that follow, we set that finding aside as clearly erroneous.

■ None of the district court's observations that amount to a finding of willfulness or bad faith relate to Ralston's intentions at the time that it violated section 43(a). For example, the opinion stresses that Ralston has not recanted its CHD-related claims or shown remorse for having made them. *Id.* at 214–15, 216. Although

these considerations can affect the propriety of a permanent injunction by showing whether a defendant is likely to cause future harm, *see, e.g., SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1233 (D.C.Cir.1989) (Ruth B. Ginsburg, J., joined by Edwards, J., concurring); *ALPO*, 720 F.Supp. at 214–15, they cannot show that an unrepentant party *has willfully* done its commercial misdeeds. Particularly in a case involving disputes over scientific support for advertising claims, a party's protestations of innocence can reflect an honest difference of scientific opinion, rather than a specific intent to mislead consumers and attack business rivals. Indeed, insisting that a losing party show contrition, especially when an appeal lies ahead, overlooks the nonpenal nature of section 35(a) remedies. *See infra* p. 970; *cf. United States v. Williams*, 891 F.2d 921, 923 (D.C.Cir.1989) (noting criminal defendant's "acceptance of responsibility," which has mitigating effect under federal sentencing guidelines).

The district court also condemns Ralston for its efforts to control regulators' and potential litigants' access to its CHD research—efforts that reportedly included destroying some documents. *ALPO*, 720 F.Supp. at 208, 216. If Ralston manipulated the evidence, the court had at its disposal tools for resolving the problem directly. *See, e.g.*, Fed.R.Civ.P. 37 (establishing sanctions for discovery abuse). Litigation misconduct alone, however, does not demonstrate indifference to competitors' or consumers' rights, the state of mind that some Lanham Act remedies require. *See Foxtrap*, 671 F.2d at 641–42; *see also Gold Seal Co. v. Weeks*, 129 F.Supp. 928, 940 (D.D.C.1955) (identifying competitors' and consumers' rights as the rights that section 43(a) primarily protects), *aff'd sub nom. S.C. Johnson & Son v. Gold Seal Co.*, 230 F.2d 832 (D.C.Cir.) (per curiam), *cert. denied*, 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956).

■ Lastly, the court's finding that Ralston carried out its CHD-related research, product change, and advertising with its competitors in mind, *see ALPO*, 720 F.Supp. at 201, added to its finding that the

research did not bear out the advertising claims, *id.* at 209, 213, does not necessarily support a conclusion that Ralston acted willfully or in bad faith. The decisions that require willfulness or bad faith for certain Lanham Act remedies are trademark infringement cases under section 43(a). *E.g., Conservative Digest*, 821 F.2d at 808 (limiting awards of attorneys' fees); *Foxtrap*, 671 F.2d at 641–42 (limiting awards of profits). In these cases, willful or bad-faith infringement usually means passing off a product or service as another seller's better-established one, or some other deliberate theft of a mark holder's good will—in sum, conduct aimed at a victim targeted by the defendant. *See, e.g., id.* at 642 n. 10 (stating, as evidence of willfulness, that infringing night club's manager commented to newspaper that "he hoped the [infringed] club's glitter would 'rub off' on his club"); *W.E. Bassett*, 435 F.2d at 662 (noting, in affirming finding of willful infringement, that infringer first tried to buy out its victim, then infringed victim's mark); *see also* J.T. McCarthy, *Trademarks and Unfair Competition* § 30:25(A), at 498 (2d ed. 1984) (before awarding an infringer's profits, courts demand proof of "'intent,' or a knowing act denoting an intent, to infringe or reap the harvest of another's mark and advertising"). This "targeting" consideration is at least as appropriate in a false advertising case. *See, e.g., Harper House*, 889 F.2d at 209 n. 8 (indirectly equating direct comparative advertising with passing off). In the broader false-advertising context, as in the trademark infringement context, "willfulness" and "bad faith" require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense. *Cf. General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987) (trademark case) ("Knowledge of another's product and an intent to compete with that product is not, however, equivalent to an intent ... to mislead and to cause customer confusion.").

To summarize, we affirm the district court's holding that Ralston violated section 43(a), but reverse its finding that the violation was willful or in bad faith.

## B. *Monetary Award in Favor of ALPO*

■ Besides challenging the district court's conclusion that its CHD-related advertising violated section 43(a), Ralston attacks the monetary remedy for that violation: a $10.4 million judgment in favor of ALPO under section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a) (1982 & Supp. V 1987).[8] Ralston concentrates its attack on the court's decision to use Ralston's advertising costs as a measure of monetary relief, a method derived from *U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1042 (9th Cir.1986). Ralston argues that the court made an error of law in adopting *U–Haul,* and that the court incorporated clearly erroneous findings of fact into its *U–Haul* analysis. Reviewing the court's decision on monetary relief for abuse of discretion, *see Conservative Digest,* 821 F.2d at 807, we agree that the award against Ralston must be vacated.

The district court's opinion states that Ralston's false advertising caused ALPO financial harm, and describes the $10.4 million award to ALPO as damages. *See, e.g., ALPO,* 720 F.Supp. at 212 ("The court finds that ALPO was damaged by Ralston's misconduct.... A particularly effective way to measure the damages sustained would be to look to the sums Ralston expended in its CHD advertising campaign."). *But cf. id.* at 215 ("The measure of damages and profits may be assessed on a number of different bases where necessary to effectuate the purposes of the Act...."). The two-part analysis supporting the amount of the monetary relief, however, shows that the court actually awarded Ralston's profits to ALPO. In deciding the amount of relief, the district court first adopted the reasoning in *U–Haul,* 793 F.2d at 1042. *See ALPO,* 720 F.Supp. at 215. In that case, the Ninth Circuit affirmed an unprecedented $40 million award to a competitor injured by a section 43(a) violation. *See U–Haul,* 793 F.2d at 1037, 1041–42 (explaining district court's alternative justifications for monetary award and deciding to affirm award based on one of those justifications). Of the award as affirmed, $12 million constituted the defendant's profits, calculated on the assumption that "the financial benefit [to the defendant] was at least equal to [its] advertising expenditures" and adjusted upward 100% under section 35(a). *Id.* at 1042; *see also id.* (repeatedly calling this part of award an award of profits). The district court here, after using the *U–Haul* approach to calculate Ralston's profits at $10.4 million, confirmed that figure by comparing it with "the 11 million dollar adjusted net profits Ralston earned from the sales of its Puppy Chow products during the period of its CHD advertising program." *ALPO,* 720 F.Supp. at 215; *see id.* at 212, 215 ("adjusted net profits" figure

8. The present version of section 35(a) states: When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, *or a violation under section 1125(a) of this title,* shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to [limitations on remedies in favor of trademark registrants who have not given notice of registration, and on remedies against innocent infringers of trademarks], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

Lanham Act § 35(a), 15 U.S.C. § 1117(a) (1988) (emphasis added) (italicized language added by 1988 Act, Pub.L. No. 100–667, sec. 129, 102 Stat. at 3945). The 1988 amendment to the section merely codified what this court had already concluded: section 35(a) remedies are available in a section 43(a) case. *See Gold Seal Co. v. Weeks,* 129 F.Supp. at 940. For the reasons stated *supra* in note 6, we will not retroactively apply the 1988 amendment. As with amended section 43(a), however, retroactively applying amended section 35(a) would make no substantive difference in this case.

equals Ralston's nationwide pre-tax profits, multiplied by ALPO's percentage share of non-Ralston puppy food market).

Leaving aside whether the *U–Haul* standard [9] or the district court's alternative calculation [10] accurately measures the profits that Ralston derived from its false advertising, we hold that this case does not justify an award of profits. Section 35(a) authorizes courts to award to an aggrieved plaintiff both plaintiff's damages and defendant's profits, but, as this court noted in *Foxtrap*, 671 F.2d at 641, courts' discretion to award these remedies has limits. Just as "any award based on plaintiff's damages requires some showing of actual loss," *id.* at 642; *see also infra* p. 969 (discussing actual damages under section 35(a)), an award based on a defendant's profits requires proof that the defendant acted willfully or in bad faith, *see Foxtrap*, 671 F.2d at 641; *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 849 F.2d 1012, 1015 (6th Cir.1988). Proof of this sort is lacking. Ralston's decision to run CHD-related advertising that lacked solid empirical support does not, without more, reflect willfulness or bad faith. *See supra* pp. 965–66; *cf. U–Haul Int'l, Inc. v. Jartran, Inc.*, 601 F.Supp. 1140, 1147–48 (D.Ariz.1984) (describing *U–Haul* defendant's targeted comparative advertising, which misrepresented plaintiff's and defendant's prices), *aff'd in part and rev'd in part*, 793 F.2d 1034 (9th Cir.1986).

In *Conservative Digest* we "left open the possibility that a court could properly award damages to a plaintiff when the defendant has been unjustly enriched." 821 F.2d at 807–08 (citing *Foxtrap*, 671 F.2d at 641 & n. 9). The unjust-enrichment theory, which emerged in trademark cases in which the infringer and the infringed were not competitors, holds that courts should divest an infringer of his profits, regardless of whether the infringer's actions have harmed the owner of the infringed trademark. Awards of profits are justified under the theory because they deter infringement in general and thereby vindicate consumers' interests. *See, e.g., Monsanto Chemical Co. v. Perfect Fit Prods. Mfg. Co.*, 349 F.2d 389, 392, 395–97 (2d Cir.1965), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966); *see also* 2 J.T. McCarthy, *supra* p. 14, § 30:25(B) (citing cases). As we state below, however, we doubt the wisdom of an approach to damages that permits courts to award profits for their sheer deterrent effect.

■ Relying on *W.E. Bassett*, 435 F.2d at 664, and *Monsanto Chemical*, 349 F.2d at 396, ALPO proposes such an approach. *See* Brief of Appellee at 40–43. Indeed, at oral argument, counsel for ALPO claimed that because *Foxtrap*, 671 F.2d at 641, cites *W.E. Bassett*, this circuit has "adopted the *Bassett* theory for [profits awards based solely on] deterrence in an egregious case." Transcript of Oral Argument at 25 (Apr. 13, 1990). *Foxtrap*, how-

---

**9.** The Ninth Circuit has already noted the limitations of the *U–Haul* rule. *See Harper House*, 889 F.2d at 209 n. 8 (justification for *U–Haul* rule weakens in cases that do not involve passing off or direct comparative advertising). Commentators, too, have criticized the decision. *See, e.g.,* Comment, *Money Damages and Corrective Advertising: An Economic Analysis*, 55 U.Chi.L. Rev. 629, 638–42 (1988) (refuting premise that defendants' advertising costs reflect value of plaintiffs' lost reputation and good will); Comment, *Monetary Relief for False Advertising Claims Arising Under Section 43(a) of the Lanham Act*, 34 UCLA L.Rev. 953, 955 n. 6, 973–74 (1987) (large awards under *U–Haul* give firms incentives to attack rivals, particularly new entrants, with false-advertising suits). *But cf.* Best, *Monetary Damages for False Advertising*, 49 U.Pitt.L.Rev. 1, 18–22 (1987) (praising *U–Haul* for easing plaintiffs' burden of proving

actual damages, but noting that the *U–Haul* surrogate measure itself can lead to overcompensation).

Ralston asserts that ALPO has waived reliance on *U–Haul. See* Brief of Appellant at 39 (claiming that ALPO expressly abandoned its *U–Haul* theory in arguments before the district court); Reply Brief of Appellant at 11 (same). Because we hold that *U–Haul* states a surrogate measure of profits and that ALPO cannot recover profits in this case, we decline to decide whether waiver has occurred, or whether any such waiver could have bound the district court.

**10.** As Ralston points out, the alternative calculation "assumes that (1) all of Ralston's Puppy Chow profits were attributable solely to its advertising and (2) all the profits attributable to advertising were due to the CHD claims." Brief of Appellant at 47 (emphasis deleted).

ever, cites *W.E. Bassett* to suggest that courts can award profits only when they find "a relatively egregious display of bad faith." *Foxtrap*, 671 F.2d at 641. Indeed, this court in *Foxtrap* advised a district court to make an award that would "deter the defendant, *yet not be a windfall to plaintiff nor amount to punitive damages.*" *Id.* at 642 n. 11 (emphasis added). Based on *Foxtrap*, as well as our concern that deterrence is too weak and too easily invoked a justification for the severe and often cumbersome remedy of a profits award, *see* Koelemay, *Monetary Relief for Trademark Infringement Under the Lanham Act*, 72 Trademark Rep. 458, 493–94, 536–37 (1982), we hold that deterrence alone cannot justify such an award.

Since this case lacks the elements required to support the court's award of Ralston's profits, we vacate the $10.4 million judgment in favor of ALPO. We do not mean, however, to deny ALPO all monetary relief for Ralston's false advertising. Because the district court has so far focused on awarding Ralston's profits, it has not yet decided what actual damages ALPO has proved. On remand, the court should award ALPO its actual damages, bearing in mind the requirement that any amount awarded have support in the record, *see Foxtrap*, 671 F.2d at 642; *Gold Seal*, 129 F.Supp. at 940, as well as the following points about the governing law.

█ In a false-advertising case such as this one, actual damages under section 35(a) can include:

—profits lost by the plaintiff on sales actually diverted to the false advertiser, *see, e.g., Foxtrap*, 671 F.2d at 642 (trademark case);

—profits lost by the plaintiff on sales made at prices reduced as a demonstrated result of the false advertising, *see, e.g., Burndy Corp. v. Teledyne Indus.*, 748 F.2d 767, 773 (2d Cir.1984);

—the costs of any completed advertising that actually and reasonably responds to the defendant's offending ads, *see, e.g., Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.*, 580 F.Supp. 634, 640–41 (S.D.N.Y.1984);[11] and

—quantifiable harm to the plaintiff's good will, to the extent that completed corrective advertising has not repaired that harm, *see, e.g., Engineered Mech. Servs., Inc. v. Applied Mech. Technology, Inc.*, 591 F.Supp. 962, 966 (M.D. La.1984); *see also* Comment, 55 U.Chi. L.Rev. at 650–57 (discussing how courts might directly measure good will).

*See generally* Koelemay, 72 Trademark Rep. at 505–07.[12]

█ When assessing these actual damages, the district court may take into account the difficulty of proving an exact amount of damages from false advertising, as well as the maxim that " 'the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.' " *Otis Clapp & Son v. Filmore Vitamin Co.*, 754 F.2d 738, 745 (7th Cir.1985) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946)). At the same time, the court must ensure that the record adequately supports all items of damages claimed and establishes a causal link between the damages and the defendant's conduct, lest the award become speculative or violate section 35(a)'s prohibition against punishment.[13] *See, e.g., Bi-*

**11.** *See also* Best, 49 U.Pitt.L.Rev. at 23 ("For this approach to be effective, the plaintiff's responsive marketing campaign must be found to have been a reasonable response to the defendant's conduct."); Comment, 55 U.Chi.L.Rev. at 633 ("Although courts should make available the defense that the counter-advertising performed was unreasonable or wasteful, most courts are willing to accept counter-advertising costs as recoverable business losses.").

**12.** The thin body of case law on actual damages for successful false-advertising claims reflects

the fact that litigants, who best understand their real losses, almost always settle these cases once a court has given its view of the merits. *See* Comment, 55 U.Chi.L.Rev. at 631.

**13.** Section 35(a)'s antipenalty clause applies to "[s]uch sum in either of the above circumstances." Lanham Act § 35(a), 15 U.S.C. § 1117(a). ALPO argues that the two "above circumstances" are the sentences in section 35(a) empowering courts to enhance damages and to adjust profits, and that, as a result, the antipenalty clause *does not apply to awards of*

*gelow*, 327 U.S. at 264, 66 S.Ct. at 580 (stating, in antitrust case, that "speculation or guesswork" cannot sustain an award of damages); *Burndy Corp.*, 748 F.2d at 773 (asserted causal connection between defendant's conduct and plaintiff's reduced-price sales lacked support in record; denial of reduced-price-sales damages affirmed); *Foxtrap*, 671 F.2d at 642 (same problem with respect to lost sales; damages award vacated and case remanded for detailed findings).

◼ Section 35(a) also authorizes the court to "enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Lanham Act § 35(a), 15 U.S.C. § 1117(a) (1982 & Supp. V 1987) (amended 1988). This provision gives the court discretion to enhance damages, as long as the ultimate award qualifies as "compensation and not [as] a penalty." *Id.; see* Koelemay, 72 Trademark Rep. at 516–19, 521–25 (discussing interplay of damages enhancement provision and antipenalty clause); *see also Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 112–13 (2d Cir.1988) (in trademark infringement case, interpreting section 35(a) to ban any awards of punitive damages), *cert. denied,* — U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Given this express statutory restriction, if the district court decides to enhance damages under section 35(a), it should explain why the enhanced award is compensatory and not punitive.

### C. *Denial of Monetary Relief in Favor of Ralston*

◼ The foregoing comments on actual damages apply as well to the monetary remedy for ALPO's false advertising. As noted above, the district court held that ALPO's veterinarian preference advertising violated section 43(a). *ALPO*, 720 F.Supp. at 209–11. Despite this decision, the court did not award Ralston any dam-

ages or profits under section 35(a) because "[t]he magnitude of the wrongdoing by Ralston in comparison to that of ALPO is so much greater that a damage award would not be justified," because ALPO, but not Ralston, had shown remorse, and because the court considered Ralston's counterclaim "an afterthought." *Id.* at 216; *see also id.* at 212 (finding an injunction the most appropriate redress for ALPO's false advertising).

◼ The Lanham Act does not authorize courts to deny monetary relief for these reasons. Once a party establishes a violation of section 43(a), section 35(a) "entitle[s]" that party to monetary relief, subject only to the statutes referred to in the section and to the principles of equity. Lanham Act § 35(a), 15 U.S.C. § 1117(a); *cf. ALPO*, 720 F.Supp. at 214 (rejecting both parties' "unclean hands" defenses, a ruling that neither party appeals). Since section 35(a) expressly provides for compensation, rather than punishment, courts dealing with offsetting meritorious claims must let the degree of injury that each party proves, rather than the degree of opprobrium that the court attaches to each party's conduct, determine the monetary relief.

At more than one point in this case, Ralston came close to admitting that it cannot prove lost profits. *See* Brief of Appellee at 47 & app. B (citing Ralston's statement, in a proposed finding of fact, that none of its regression analyses proved diverted sales); Reply Brief of Appellant at 18–19 ("Ralston's position ... is that under a *proper* construction of the Lanham Act, *neither* party can quantify lost profits sufficiently to recover damages."). In this appeal, however, Ralston has shown that it still considers its lost profits a live issue. *See id.* at 18 & n. 40 (citing evidence, other than regressions, of lost sales). Since Ralston has some evidence of lost sales, and since, more importantly, section 35(a) en-

---

unenhanced damages or unadjusted profits. *See* Brief of Appellee at 45–46. Since this case does not present an antipenalty clause attack on such an award, we leave the issue for later. *Cf. Foxtrap*, 671 F.2d at 642 n. 11 (advising district

court, in context not necessarily involving enhancement of damages or adjustment of profits, to "assure that the award it orders will ... not be a windfall to plaintiff nor amount to punitive damages").

titles Ralston to damages other than lost profits, *see supra* p. 969, the district court should on remand award Ralston whatever actual damages it has proved. In this connection, as with ALPO's damages, the court should decide whether the parties have already had a sufficient opportunity to prove the types of damages outlined above, or whether further hearings are necessary.

## D. *Attorneys' Fees*

 The court awarded each company the attorneys' fees associated with its successful false-advertising claim. *ALPO*, 720 F.Supp. at 216. Only Ralston has appealed.

 Section 35(a) entitles prevailing parties to attorneys' fees "in exceptional cases." This court's decision in *Conservative Digest*, 821 F.2d at 808, establishes an abuse-of-discretion standard for review of attorneys' fees awards. That same decision, however, holds that a court can award a plaintiff her attorneys' fees only in cases involving willful or bad-faith conduct by the defendant; applying that standard, the *Conservative Digest* court affirmed a denial of fees to a plaintiff who had proved trade dress infringement, but not willfulness or bad faith on the part of the infringer. *Id.* Seeing no relevant distinction between fee awards in trade dress infringement actions and fee awards in false-advertising actions, we apply *Conservative Digest* here. *See id.* at 803 (section 43(a) covers trade dress infringement).

 In announcing its fee awards, the district court did not expressly find that Ralston had acted willfully or in bad faith. Indeed, it made no finding that this case is "exceptional" in any respect. *See ALPO*, 720 F.Supp. at 215, 216; *supra* p. 963. During a postjudgment hearing, the court explained that since, in its view, federal agencies are not sufficiently enforcing the laws against false advertising, it had awarded fees "to encourage private attorneys general in this case." Transcript of Motions Hearing at 7 (Sept. 18, 1989). Since neither the court's opinion nor its later statements support the award with a finding of willfulness or bad faith, and since we have decided that any such finding would be clearly erroneous, *see supra* pp. 965–66, we reverse the district court's decision to award attorneys' fees to ALPO.[14]

## E. *Scope of Injunction Against Ralston*

 In addition to awarding monetary relief, the district court enjoined both parties to prepare, secure court approval of, and disseminate corrective releases, and it enjoined both parties from renewing their false advertising. In the only challenge leveled at these injunctions, Ralston asserts that the prohibitory injunction against it is overbroad, both on its face and as implemented by the district court. We agree, and remand the relevant orders for entry and implementation of a narrower injunction.

The injunction at issue permanently bars Ralston and its associates "from making any advertising or other related claims that are false, misleading, deceptive or made without substantiation in fact concerning the effects of Ralston Dog food products on hip joint formation, hip joint laxity, Canine Hip Dysplasia, Degenerative Joint Disease and similar conditions." *ALPO*, 720 F.Supp. at 216. The court also ordered Ralston and ALPO to adopt procedures for ensuring compliance with the injunction. *Id.* at 217. Ralston and ALPO have complied, and an October 11, 1989 district court order formalizes the procedures, which are themselves a subject of appeal. *See supra* note 2. The relevant section of these pro-

---

14. Because ALPO has failed to challenge the district court's award of attorneys' fees to Ralston, we do not disturb the award. *See, e.g., Smith v. Nixon*, 807 F.2d 197, 204 n. 4 (D.C.Cir. 1986) (plaintiffs waived potential claims by neglecting to press them on appeal). Although, in some cases, we might forgive a party's waiver and reverse a district court's determination as plain error, we decline to do so here. This court typically reviews a district court's ruling for plain error only when a party has objected to the ruling on appeal. *See, e.g., Anderson v. Group Hosp., Inc.*, 820 F.2d 465, 469 n. 1 (D.C. Cir.1987); *Hobson v. Wilson*, 737 F.2d 1, 31–32, 32 n. 96 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

cedures subjects "any advertising or other related claim concerning the effects of Ralston dog or puppy food products or low anion gap diets on hip joint formation, hip joint laxity, canine hip dysplasia, degenerative joint disease, and similar conditions" to a pre-clearance process. Procedures for Assuring Compliance with Injunctive Provisions of July 28, 1989 Order para. 5(b) (Oct. 11, 1989); *see id.* paras. 6–8. Before releasing any statement in this category, Ralston must have a court-approved "outside attorney" write an opinion on whether the proposed statement violates the injunctions. *Id.* paras. 6–7. Ralston must submit the statement and the attorney's opinion letter to ALPO and the court, which then have fifteen days to object before Ralston can make its statement. *Id.* para. 8.[15]

Since the district court originally entered its injunctions, it has decided that the prohibitory injunction applies to Ralston and non-Ralston scientists' scholarly articles on the anion gap theory, even when those articles do not refer to Ralston products. *See* Transcript of Motions Hearing at 20–22 (Sept. 18, 1989) (scientists who publish any such articles without getting court's advance approval "do it at their risk," *id.* at 22); *see also id.* at 22, 25–26 (suggesting that scientists could secure court's approval by referring in article to court's fact findings). In addition, a few weeks before the court approved the compliance procedures, it threatened Ralston with contempt for stating, in response to a veterinary journal's inquiry, that Ralston disagreed with the district court's ruling and planned to appeal. *See* Transcript of Status Call at 19–21 (Sept. 22, 1989); *see also* Reotutar, *Pet Food Makers Found Guilty of False Advertising Claims,* 195 J. Am. Veterinary Med. Ass'n 873 (1989) (reporting Ralston's statement, which Ralston unsuccessfully tried to retract after court demanded immediate retraction).

The law requires that courts closely tailor injunctions to the harm that they address. *Gulf Oil Corp. v. Brock,* 778 F.2d

834, 842 (D.C.Cir.1985); *see also Foxtrap,* 671 F.2d at 640 ("[T]he scope of an injunction should be determined by balancing [the] harm to the plaintiff, other means of avoiding such harm, and the relative inconvenience to the defendant."); Fed.R.Civ.P. 65(d) (injunctive orders "shall be specific in terms"). In enjoining Ralston, the district court identified the harm redressed by the injunctions as deception of puppy food buyers and erosion of ALPO's business. *See ALPO,* 720 F.Supp. at 214–15. Yet the prohibitory injunction, both as entered and, particularly, as implemented, suppresses more speech than protecting these interests requires. ALPO's false-advertising claim against Ralston involves a dispute over whether Ralston may commercially claim that Puppy Chow confers certain unproved health benefits. Redressing the harm that these claims have caused in the puppy food market does not require that a court supervise all future debate on the anion gap theory. Moreover, we see little prospect that readers of a veterinary magazine who encounter a report on the false-advertising judgment against Ralston will conclude, simply because Ralston has had an opportunity to proclaim its innocence, that Puppy Chow actually ameliorates CHD. Especially given the prior restraint involved in the procedures described above, we think it important that the injunction and procedures cover only the speech most likely to deceive consumers and harm ALPO in the ways described in the district court's opinion: CHD-related *advertising. See Better Business Bureau v. Medical Directors, Inc.,* 681 F.2d 397, 404–05 (5th Cir.1982) (narrowing injunction to remove ban on noncommercial statements).

We remand the prohibitory injunction against Ralston, 720 F.Supp. at 216, for removal of the words "or other related," and remand the October 11, 1989 order for removal of the words "or other related" from paragraphs 5(b) and 8 and the words "or related" from paragraph 6. These changes, which limit the injunction and pro-

---

**15.** The procedures, which ALPO has not appealed, subject "any advertising or other related claim concerning a veterinarian preference for ALPO dog or puppy food products" to the same pre-clearance process. Procedures for Assuring Compliance para. 5(a).

cedures to advertising,[16] will tailor the injunction to the harms attacked by ALPO's section 43(a) claim.

### III. CONCLUSION

We affirm the district court's decision that both Ralston and ALPO have violated section 43(a) of the Lanham Act. We vacate the judgment in favor of ALPO, and reverse the district court's decision to award ALPO attorneys' fees. We remand the case to the district court so that it may redetermine the damages to which each party is entitled under section 35(a) of the Lanham Act and modify the prohibitory injunction against Ralston.

*It is so ordered.*

---

16. When it implements the modified injunction, the district court should not define "advertising" as narrowly as, for example, "commercial speech" in the first amendment sense. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (commercial speech is "speech which does 'no more than propose a commercial transaction'") (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67, 103 S.Ct. 2875, 2879–2880, 77 L.Ed.2d 469 (1983) (not all advertising material, material that refers to specific products, or material distributed with an economic motive is commercial speech). The court should note, however, that section 43(a) reaches only advertising "in connection with any goods or services," Lanham Act § 43(a), 15 U.S.C. § 1125(a) (1982), and that the section focuses on "words or other symbols tending falsely to describe or represent [goods or services]," *id.*